DAVIS ET AL. *v.* SCHERER

No. 83–490.   Argued April 16, 1984—Decided June 28, 1984

184

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 197.

*Mitchell D. Franks* argued the cause for appellants. With him on the briefs were *Jim Smith,* Attorney General of Florida, and *Vicki Gordon Kaufman, Bruce A. Minnick,* and *Pamela Lutton-Shields,* Assistant Attorneys General.

*Richard G. Wilkins* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller, Barbara L. Herwig,* and *John F. Cordes.*

*Bruce S. Rogow* argued the cause and filed a brief for appellee.*

JUSTICE POWELL delivered the opinion of the Court.

Appellants in this case challenge the holding of the Court of Appeals that a state official loses his qualified immunity from suit for deprivation of federal constitutional rights if he is found to have violated the clear command of a state administrative regulation.

I

The present controversy arose when appellee Gregory Scherer, who was employed by the Florida Highway Patrol as a radio-teletype operator, applied for permission from the Patrol to work as well for the Escambia County Sheriff's Office as a reserve deputy. To avoid conflicts of interest, an order of the Florida Department of Highway Safety and Motor Vehicles required that proposed outside employment of Patrol members be approved by the Department. A letter from appellee's troop commander, Capt. K. S. Sconiers, dated September 1, 1977, granted appellee permission to accept the part-time work. The letter noted that permission would be rescinded "should [the] employment interfere . . . with your duties with [the] department." 543 F. Supp. 4, 8 (ND Fla. 1981). Later that month, Capt. Sconiers informed appellee by memorandum that permission to accept the employment was revoked. As Capt. Sconiers explained at trial, his superiors in the Highway Patrol had determined that appellee's reserve deputy duties could conflict with his duties at the Highway Patrol.

Appellee continued to work at the second job, despite the revocation of permission. Oral discussions and an exchange of letters among appellee and his superiors ensued. Sgt.

---

*Michael S. Helfer, Burt Neuborne, and Charles S. Sims filed a brief for the American Civil Liberties Union as amicus curiae urging affirmance.

Clark, appellee's immediate superior, advised appellee that he was violating instructions; appellee explained that he had invested too much money in uniforms to give up his part-time work. Lt. Wiggins, the next highest officer in the chain of command, then orally and by memorandum ordered appellee to quit his part-time job. Appellee explained to Lt. Wiggins that he saw no conflict between the two jobs and would not quit his second job.

Sgt. Clark and Lt. Wiggins had submitted memoranda to Capt. Sconiers that described appellee's continued employment and their conversations with appellee. Appellee also wrote to Capt. Sconiers explaining that he saw no reason to resign his outside employment. So advised, Capt. Sconiers recommended to Col. J. E. Beach, director of the Florida Highway Patrol, that appellee be suspended for three days for violation of the dual-employment policy. Capt. Sconiers submitted a number of documents, including his own letters approving appellee's request and rescinding the approval; appellee's letter of request and subsequent letter explaining his refusal to quit his job; and the memoranda of Sgt. Clark and Lt. Wiggins.[1] On the basis of these documents, Col. Beach on October 24, 1977, ordered that appellee's employment with the Florida Highway Patrol be terminated.

On November 10, 1977, appellee filed an appeal with the Florida Career Service Commission. Before the Commission had heard appellee's administrative appeal from his dismissal, appellee and the Department settled the dispute. The settlement reinstated appellee with backpay. But friction between appellee and his superiors continued, and in January 1979, after appellee was suspended from the Patrol, he resigned "to avoid further harassment and to remove a cloud over his employability." *Id.*, at 11.

---

[1] One memorandum reported to Capt. Sconiers that appellee had continued to work at his second job; a second had been addressed by Lt. Wiggins to appellee; other memoranda summarized Lt. Wiggins' and Sgt. Clark's discussions with appellee.

Appellee then filed the present suit against appellants in the United States District Court for the Northern District of Florida, seeking relief under 42 U. S. C. § 1983.[2] Appellee's complaint alleged that appellants in 1977 had violated the Due Process Clause of the Fourteenth Amendment by discharging appellee from his job without a formal pretermination or a prompt post-termination hearing.[3] Appellee requested a declaration that his rights had been violated and an award of money damages.

The District Court granted the requested relief for violation of appellee's Fourteenth Amendment rights.[4] The court found that appellee had a property interest in his job and that the procedures followed by appellants to discharge appellee were constitutionally "inadequate" under the Fourteenth Amendment. *Id.*, at 14. Further, the court declared unconstitutional Florida's statutory provisions governing removal of state employees, Fla. Stat. § 110.061 (1977). Finally, the District Court concluded that appellants had forfeited their qualified immunity from suit under § 1983 because appellee's "due process rights were clearly established at the time of his October 24, 1977, dismissal." *Id.*, at 16.

Five days after entry of the District Court's order, the Court of Appeals for the Fifth Circuit decided *Weisbrod* v. *Donigan*, 651 F. 2d 334 (1981). The Court of Appeals there held that Florida officials in 1978 had ‐ violated no well-

---

[2] Appellant Ralph Davis was Executive Director of the Department of Highway Safety and Motor Vehicles at the time of appellee's discharge from employment. Appellant Chester Blakemore succeeded Davis to that position and is a party only in his official capacity. Appellant Col. J. Eldridge Beach is Director of the Florida Highway Patrol, a division of the Department of Highway Safety and Motor Vehicles; as noted above, he held that position at the time of appellee's discharge.

[3] The complaint also alleged that appellants, in violation of the Fourteenth Amendment, had coerced appellee to accept an inadequate settlement and had infringed upon appellee's right of privacy guaranteed by the First and Ninth Amendments.

[4] The District Court rejected appellee's other constitutional claims.

established due process rights in discharging a permanent state employee without a pretermination or a prompt post-termination hearing. On motion for reconsideration, the District Court found that *Weisbrod* required it to vacate its prior holding that appellants had forfeited their immunity by violating appellee's clearly established constitutional rights. The court nevertheless reaffirmed its award of monetary damages. It reasoned that proof that an official had violated clearly established constitutional rights was not the "sole way" to overcome the official's claim of qualified immunity. Applying the "totality of the circumstances" test of *Scheuer* v. *Rhodes*, 416 U. S. 232, 247–248 (1974), the District Court held that "if an official violates his agency's explicit regulations, which have the force of state law, [that] is evidence that his conduct is unreasonable." 543 F. Supp., at 19.[5] In this respect, the court noted that the personnel regulations of the Florida Highway Patrol clearly required "a complete investigation of the charge and an opportunity [for the employee] to respond in writing." *Id.*, at 20.[6] The District Court concluded that appellants in discharging appellee had "followed procedures contrary to the department's rules and

---

[5] The District Court relied in part on the reasoning of *Williams* v. *Treen*, 671 F. 2d 892 (CA5 1982), cert. denied, 459 U. S. 1126 (1983), that had held that official conduct in violation of an explicit and clearly established state regulation was *per se* unreasonable. 671 F. 2d, at 899.

[6] These regulations specified in pertinent part:

"Upon receiving a report of . . . a violation of Department or Division rules and regulations . . . , the Director shall order a complete investigation to determine the true facts concerning the circumstances surrounding the alleged offense. The completed investigation report will also contain a written statement made by the employee against whom the complaint was made. If after a thorough study of all information concerning the violation, the Director decides that a . . . dismissal will be in order, he will present the employee in writing with the reason or reasons for such actions." General Order No. 43, § 1.C (Sept. 1, 1977), quoted in 543 F. Supp., at 19–20.

regulations"; therefore, appellants were "not entitled to qualified immunity because their belief in the legality of the challenged conduct was unreasonable." *Ibid.* The court explicitly relied upon the official violation of the personnel regulation, stating that "[i]f [the] departmental order had not been adopted . . . prior to [appellee's] dismissal, no damages of any kind could be awarded." *Ibid.* The District Court's order amending the judgment did not discuss the issue whether appellants violated appellee's federal constitutional rights. On that issue, the District Court relied upon its previous opinion; the court did not indicate that the personnel regulation was relevant to its analysis of appellee's rights under the Due Process Clause.

The District Court also amended its judgment declaring the Florida civil service statute unconstitutional. The State's motion for reconsideration had informed the court that the statute had been repealed by the Florida Legislature. The District Court therefore declared unconstitutional the provisions of the newly enacted civil service statute, Fla. Stat., ch. 110 (1982 and Supp. 1983), insofar as "they fail to provide a prompt post-termination hearing." *Id.*, at 21.

The Court of Appeals affirmed on the basis of the District Court's opinion. *Scherer* v. *Graham,* 710 F. 2d 838 (CA11 1983). We noted probable jurisdiction, 464 U. S. 1017 (1983), to consider whether the Court of Appeals properly had declared the Florida statute unconstitutional and denied appellants' claim of qualified immunity. Appellants do not seek review of the District Court's finding that appellee's constitutional rights were violated. As appellee now concedes that the District Court lacked jurisdiction to adjudicate the constitutionality of the Florida statute enacted in 1981, we consider only the issue of qualified immunity.[7] We reverse.

---

[7] The Florida civil service statute now in force replaced the statute under which appellee's employment was terminated. As the current state

190

## II

In the present posture of this case, the District Court's decision that appellants violated appellee's rights under the Fourteenth Amendment is undisputed.[8] This finding of the District Court—based entirely upon federal constitutional law—resolves the merits of appellee's underlying claim for relief under § 1983. It does not, however, decide the issue of damages. Even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard. The precise standard for determining when an official may assert the qualified immunity defense has been clarified by recent cases, see *Wood* v. *Strickland*, 420 U. S. 308 (1975); *Butz* v. *Economou*, 438 U. S. 478 (1978); *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982). The present case requires us to consider the application of the standard where the official's conduct violated a state regulation as well as a provision of the Federal Constitution.

The District Court's analysis of appellants' qualified immunity, written before our decision in *Harlow* v. *Fitzgerald*,

statute was never applied to appellee, he lacks standing to question its constitutionality. Cf. *Golden* v. *Zwickler*, 394 U. S. 103 (1969).

Appellee's concession does not deprive the Court of appellate jurisdiction over the remaining issue in the case. In cases where the Court of Appeals has declared a state statute unconstitutional, this Court may decide the "Federal questions presented," 28 U. S. C. § 1254(2). Cf. *Flournoy* v. *Wiener*, 321 U. S. 253, 263 (1944); *Leroy* v. *Great Western United Corp.*, 443 U. S. 173 (1979). Under § 1254(2), the Court retains discretion to decline to consider those issues in the case not related to the declaration that the state statute is invalid. In the present case, however, we choose to consider the important question whether the District Court and the Court of Appeals properly denied appellants' good-faith immunity from suit.

[8] As we discuss below, it is contested whether these constitutional rights were clearly established at the time of appellants' conduct.

*supra*, rests upon the "totality of the circumstances" surrounding appellee's separation from his job. This Court applied that standard in *Scheuer* v. *Rhodes*, 416 U. S., at 247–248. As subsequent cases recognized, *Wood* v. *Strickland*, *supra*, at 322, the "totality of the circumstances" test comprised two separate inquiries: an inquiry into the objective reasonableness of the defendant official's conduct in light of the governing law, and an inquiry into the official's subjective state of mind. *Harlow* v. *Fitzgerald*, *supra*, rejected the inquiry into state of mind in favor of a wholly objective standard. Under *Harlow*, officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U. S., at 818. Whether an official may prevail in his qualified immunity defense depends upon the "objective reasonableness of [his] conduct as measured by reference to clearly established law." *Ibid.*(footnote deleted). No other "circumstances" are relevant to the issue of qualified immunity.

Appellee suggests, however, that the District Court judgment can be reconciled with *Harlow* in two ways. First, appellee urges that the record evinces a violation of constitutional rights that were clearly established. Second, in appellee's view, the District Court correctly found that, absent a violation of clearly established constitutional rights, appellants' violation of the state administrative regulation—although irrelevant to the merits of appellee's underlying constitutional claim—was decisive of the qualified immunity question. In our view, neither submission is consistent with our prior cases.

A

Appellee contends that the District Court's reliance in its qualified immunity analysis upon the state regulation was "superfluous," Brief for Appellee 19, because the federal constitutional right to a pretermination or a prompt post-

termination hearing was well established in the Fifth Circuit at the time of the conduct in question.   As the District Court recognized in rejecting appellee's contention, *Weisbrod* v. *Donigan*, 651 F. 2d 334 (CA5 1981), is authoritative precedent to the contrary.   The Court of Appeals in that case found that the State had violated no clearly established due process right when it discharged a civil service employee without *any* pretermination hearing.[9]

Nor was it unreasonable in this case, under Fourteenth Amendment due process principles, for the Department to conclude that appellee had been provided with the fundamentals of due process.[10]   As stated above, the District Court found that appellee was informed several times of the Department's objection to his second employment and took advantage of several opportunities to present his reasons for believing that he should be permitted to retain his part-time employment despite the contrary rules of the Patrol.   Appellee's statement of reasons and other relevant information

---

[9] We see no reason to doubt, as does the partial dissent, that the Court of Appeals in *Weisbrod* had full knowledge of its own precedents and correctly construed them.

[10] As the partial dissent explains at some length, the decisions of this Court by 1978 had required "some kind of a hearing," *Board of Regents* v. *Roth*, 408 U. S. 564, 570, n. 7 (1972), prior to discharge of an employee who had a constitutionally protected property interest in his employment.   But the Court had not determined what kind of a hearing must be provided. Such a determination would require a careful balancing of the competing interests—of the employee and the State—implicated in the official decision at issue.   See *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976).   As the Court had considered circumstances in which no hearing at all had been provided prior to termination, *Perry* v. *Sindermann*, 408 U. S. 593 (1972), or in which the requirements of due process were met, *Board of Regents* v. *Roth, supra; Arnett* v. *Kennedy*, 416 U. S. 134 (1974); *Bishop* v. *Wood*, 426 U. S. 341 (1976); *Codd* v. *Velger*, 429 U. S. 624 (1977), there had been no occasion to specify any minimally acceptable procedures for termination of employment.   The partial dissent cites no case establishing that appellee was entitled to more elaborate notice, or a more formal opportunity to respond, than he in fact received.

were before the senior official who made the decision to discharge appellee. And Florida law provided for a full evidentiary hearing after termination. We conclude that the District Court correctly held that appellee has demonstrated no violation of his *clearly established* constitutional rights.

## B

Appellee's second ground for affirmance in substance is that upon which the District Court relied. Appellee submits that appellants, by failing to comply with a clear state regulation, forfeited their qualified immunity from suit for violation of federal constitutional rights.

Appellee makes no claim that the appellants' violation of the state regulation either is itself actionable under § 1983 or bears upon the claim of constitutional right that appellee asserts under § 1983.[11] And appellee also recognizes that *Harlow* v. *Fitzgerald* makes immunity available only to officials whose conduct conforms to a standard of "objective legal reasonableness." 457 U. S., at 819. Nonetheless, in appellee's view, official conduct that contravenes a statute or regulation is not "objectively reasonable" because officials fairly may be expected to conform their conduct to such legal norms. Appellee also argues that the lawfulness of official conduct under such a statute or regulation may be determined early in the lawsuit on motion for summary judgment. Appellee urges therefore that a defendant official's violation of a clear statute or regulation, although not itself the basis of suit, should deprive the official of qualified immunity from damages for violation of other statutory or constitutional provisions.

---

[11] State law may bear upon a claim under the Due Process Clause when the property interests protected by the Fourteenth Amendment are created by state law. See *Board of Regents* v. *Roth, supra,* at 577. Appellee's property interest in his job under Florida law is undisputed. Appellee does not contend here that the procedural rules in state law govern the constitutional analysis of what process was due to him under the Fourteenth Amendment.

On its face, appellee's reasoning is not without some force. We decline, however, to adopt it. Even before *Harlow*, our cases had made clear that, under the "objective" component of the good-faith immunity test, "an official would not be held liable in damages under § 1983 unless *the constitutional right he was alleged to have violated* was 'clearly established' at the time of the violation." *Butz* v. *Economou*, 438 U. S., at 498 (emphasis added); accord, *Procunier* v. *Navarette*, 434 U. S. 555, 562 (1978). Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.[12]

We acknowledge of course that officials should conform their conduct to applicable statutes and regulations. For

---

[12] In *Harlow*, the Court acknowledged that officials may lose their immunity by violating "clearly established statutory . . . rights." 457 U. S., at 818. This is the case where the plaintiff seeks to recover damages for violation of those statutory rights, as in *Harlow* itself, see *id.*, at 820, n. 36, and as in many § 1983 suits, see, *e. g.*, *Maine* v. *Thiboutot*, 448 U. S. 1 (1980) (holding that § 1983 creates cause of action against state officials for violating federal statutes). For the reasons that we discuss, officials sued for violations of rights conferred by a statute or regulation, like officials sued for violation of constitutional rights, do not forfeit their immunity by violating some *other* statute or regulation. Rather, these officials become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages. And if a statute or regulation does give rise to a cause of action for damages, clear violation of the statute or regulation forfeits immunity only with respect to damages caused by that violation. In the present case, as we have noted, there is no claim that the state regulation itself or the laws that authorized its promulgation create a cause of action for damages or provide the basis for an action brought under § 1983.

*Harlow* was a suit against federal, not state, officials. But our cases have recognized that the same qualified immunity rules apply in suits against state officers under § 1983 and in suits against federal officers under *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U. S. 388 (1971). See *Butz* v. *Economou*, 438 U. S., at 504. Neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation—of federal or of state law—unless that statute or regulation provides the basis for the cause of action sued upon.

that reason, it is an appealing proposition that the violation of such provisions is a circumstance relevant to the official's claim of qualified immunity. But in determining what circumstances a court may consider in deciding claims of qualified immunity, we choose "between the evils inevitable in any available alternative." *Harlow* v. *Fitzgerald*, 457 U. S., at 813–814. Appellee's submission, if adopted, would disrupt the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties. The qualified immunity doctrine recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated. See *Butz* v. *Economou, supra,* at 506–507; *Harlow* v. *Fitzgerald, supra,* at 814, 818–819. Yet, under appellee's submission, officials would be liable in an indeterminate amount for violation of *any* constitutional right—one that was not clearly defined or perhaps not even foreshadowed at the time of the alleged violation—merely because their official conduct also violated some statute or regulation. And, in § 1983 suits, the issue whether an official enjoyed qualified immunity then might depend upon the meaning or purpose of a state administrative regulation, questions that federal judges often may be unable to resolve on summary judgment.

Appellee proposes that his new rule for qualified immunity be limited by requiring that plaintiffs allege clear violation of a statute or regulation that advanced important interests or was designed to protect constitutional rights. Yet, once the door is opened to such inquiries, it is difficult to limit their scope in any principled manner. Federal judges would be granted large discretion to extract from various statutory and administrative codes those provisions that seem to them sufficiently clear or important to warrant denial of qualified immunity. And such judgments fairly could be made only after an extensive inquiry into whether the official in the

circumstances of his decision should have appreciated the applicability and importance of the rule at issue. It would become more difficult, not only for officials to anticipate the possible legal consequences of their conduct,[13] but also for trial courts to decide even frivolous suits without protracted litigation.

Nor is it always fair, or sound policy, to demand official compliance with statute and regulation on pain of money damages. Such officials as police officers or prison wardens, to say nothing of higher level executives who enjoy only qualified immunity, routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them. These officials are subject to a plethora of rules, "often so voluminous, ambiguous, and contradictory, and in such flux that officials can only comply with or enforce them selectively." See P. Schuck, Suing Government 66 (1983). In these circumstances, officials should not err always on the side of caution. "[O]fficials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office." *Scheuer* v. *Rhodes*, 416 U. S., at 246.[14]

---

[13] Officials would be required not only to know the applicable regulations, but also to understand the intent with which each regulation was adopted. Such an understanding often eludes even trained lawyers with full access to the relevant legislative or administrative materials. It is unfair and impracticable to require such an understanding of public officials generally.

[14] Appellee urges as well that appellants' violation of the personnel regulation constituted breach of their "ministerial" duty—established by the regulation—to follow various procedures before terminating appellee's employment. Although the decision to discharge an employee clearly is discretionary, appellee reasons that the Highway Patrol regulation deprived appellants of all discretion in determining what procedures were to be followed prior to discharge. Under this view, the *Harlow* standard is inapposite because this Court's doctrine grants qualified immunity to officials in the performance of discretionary, but not ministerial, functions.

Appellee's contention mistakes the scope of the "ministerial duty" exception to qualified immunity in two respects. First, as we have discussed,

## III

A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue. As appellee has made no such showing, the judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, concurring in part and dissenting in part.

In *Harlow* v. *Fitzgerald,* 457 U. S. 800 (1982), the Court decided that Government officials seeking to establish qualified immunity must show that the acts or omissions violating the plaintiff's rights were objectively reasonable—specifically, that the conduct at issue did not "violate clearly estab-

---

breach of a legal duty created by the personnel regulation would forfeit official immunity only if that breach itself gave rise to the appellee's cause of action for damages. This principle equally applies whether the regulation created discretionary or ministerial duties. Even if the personnel regulation did create a ministerial duty, appellee makes no claim that he is entitled to damages simply because the regulation was violated. See *supra,* at 193–194, and n. 12.

In any event, the rules that purportedly established appellants' "ministerial" duties in the present case left to appellants a substantial measure of discretion. Cf. *Amy* v. *The Supervisors,* 11 Wall. 136, 138 (1871); *Kendall* v. *Stokes,* 3 How. 87, 98 (1845). Appellants were to determine, for example, what constituted a "complete investigation" and a "thorough study of all information" sufficient to justify a decision to terminate appellee's employment. See n. 6, *supra.* And the District Court's finding that appellants ignored a clear legal command does not bear on the "ministerial" nature of appellants' duties. A law that fails to specify the precise action that the official must take in each instance creates only discretionary authority; and that authority remains discretionary however egregiously it is abused. Cf. *Kendall* v. *Stokes, supra.*

lished statutory or constitutional rights of which a reasonable person would have known." *Id.*, at 818. The Court today does not purport to change that standard. Yet it holds that, despite discharging a civil service employee in 1977 without meaningful notice and an opportunity to be heard, appellants are entitled to immunity from a suit for damages. The Court reaches this decision essentially by ignoring both the facts of this case and the law relevant to appellants' conduct at the time of the events at issue. In my view, appellants plainly violated appellee's clearly established rights and the Court's conclusion to the contrary seriously dilutes *Harlow*'s careful effort to preserve the availability of damages actions against governmental officials as a critical "avenue for vindication of constitutional guarantees." *Id.*, at 814. Accordingly, I dissent from that portion of the judgment reversing the award of damages.[1]

In order to determine whether a defendant has violated a plaintiff's clearly established rights, it would seem necessary to make two inquiries, both of which are well within a court's familiar province: (1) which particular act or omission of the defendant violated the plaintiff's federal rights, and (2) whether governing case or statutory law would have given a reasonable official cause to know, at the time of the relevant events, that those acts or omissions violated the plaintiff's rights. The Court, however, asks neither question. Its brief treatment of the issue includes no reference to the District Court's findings of fact with respect to the conduct at issue here. This is not surprising since those findings—which were affirmed summarily by the Court of Appeals and which appellants do not claim to be clearly erroneous—demonstrate that appellee was *never* informed that he might be fired for violating regulations against dual employment.

---

[1] I agree that the District Court erred in declaring the new Florida civil service statute unconstitutional, see *ante*, at 189, and therefore concur in that portion of the judgment vacating paragraph 2 of the District Court's amended order. See 543 F. Supp. 4, 21 (ND Fla. 1981).

Nor did appellee ever have an opportunity to persuade the relevant decisionmaker that he should not be disciplined.

The regulation appellee was ultimately fired for violating required only that Patrol members receive prior approval of outside employment, in order to avoid conflicts of interest with regular duties. 543 F. Supp. 4, 8 (ND Fla. 1981). Upon request, appellee obtained approval from his troop commander for part-time work as a security guard on a movie set. Some three weeks later, the commander revoked the approval and there followed an exchange of memos between appellee's immediate superiors and the commander indicating that appellee did not wish to relinquish the part-time job. Apparently without informing appellee, the commander then recommended to the director of the Highway Patrol, Col. Beach, that appellee be suspended for three days and, nearly a week later, an intermediate superior ordered appellee to terminate his outside employment. On the same day, appellee wrote to the commander, stating that he did not believe his outside work caused any conflict of interest. Although some officials in the Department suggested to each other ways in which appellee's work might create a conflict, "[n]o one ever identified the conflict to plaintiff; [and the superior who had ordered appellee to terminate the job] testified he didn't know what the conflict was." *Ibid.* Meanwhile, Beach, the official with authority to terminate appellee, received copies of the various letters that had been exchanged and, without informing appellee or soliciting his views, decided to discharge him. As the District Court summarized:

"By certified letter dated October 24, 1977 and received by plaintiff on October 25, 1977, Scherer was terminated from his FHP employment effective October 20, 1977. At no time prior to the letter of termination was the plaintiff given notice in writing of a proposed discharge or an opportunity to respond verbally or in writing to the official charged with making the termination decision,

200 the defendant Beach. At no time prior to October 25, 1977, was the plaintiff notified of any right that he might have to respond to Col. Beach's letter of dismissal." *Id.*, at 8–9.

The District Court further found that two other Highway Patrol employees in appellee's troop had been given approval to engage in the very same secondary employment for which appellee was fired, and their approval "was never revoked." *Id.*, at 8, n. 1. Moreover, after being terminated, appellee successfully argued before a Florida administrative officer that the regulation prohibiting dual employment had not been validly adopted and was therefore void. *Id.*, at 9. In short, although appellee was warned not to continue the second employment, he had no reason to believe prior to being fired that retention of the second job constituted grounds for termination, and indeed he had several reasons for believing otherwise. Nor did he have any opportunity to challenge, before the relevant decisionmaker, either his termination or the underlying conclusion that his retention of the second job created a conflict of interest.

By failing to warn appellee that his conduct could result in deprivation of his protected property interest in his Highway Patrol job and by denying him an opportunity to challenge that deprivation, appellants violated the most fundamental requirements of due process of law—meaningful notice and a reasonable opportunity to be heard. Contrary to the Court's conclusion, these requirements were "clearly established" long before October 25, 1977, the date on which appellee learned he was fired. As long ago as 1914, the Court emphasized that "[t]he fundamental requisite of due process of law is the opportunity to be heard." *Grannis* v. *Ordean*, 234 U. S. 385, 394. In 1925, the Court explained that a government failure to afford reasonable notice of the kinds of conduct that will result in deprivations of liberty and property "violates the first essential of due process of law." *Connally*

v. *General Construction Co.*, 269 U. S. 385, 391. And in several decisions in the 1950's, the Court concluded that public employees have interests in maintaining their jobs that cannot be abridged without due process. *E. g.*, *Slochower* v. *Board of Education*, 350 U. S. 551 (1956); *Wieman* v. *Updegraff*, 344 U. S. 183 (1952); see *Board of Regents* v. *Roth*, 408 U. S. 564, 576–577 (1972).

In January 1972, nearly six years prior to appellee's termination, the Court reaffirmed that

> "[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' *Boddie* v. *Connecticut*, 401 U. S. 371, 379. 'While "[m]any controversies have raged about . . . the Due Process Clause," . . . it is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate [a protected] interest . . . , it must afford "notice and opportunity for hearing appropriate to the nature of the case" *before* the termination becomes effective.' *Bell* v. *Burson*, 402 U. S. 535, 542. For the rare and extraordinary situations in which we have held that deprivation of a protected interest need not not be preceded by opportunity for some kind of hearing, see, *e. g.*, *Central Union Trust Co.* v. *Garvan*, 254 U. S. 554, 566; *Phillips* v. *Commissioner*, 283 U. S. 589, 597; *Ewing* v. *Mytinger & Casselberry, Inc.*, 339 U. S. 594." *Board of Regents* v. *Roth*, *supra*, at 570, n. 7.

Similarly, in 1974, based on an exhaustive review of our cases, JUSTICE WHITE explained that "where there is a legitimate entitlement to a job, as when a person is given employment subject to his meeting certain specific conditions, due process requires, in order to insure against arbitrariness by the State in the administration of its law, that

a person be given notice and a hearing before he is finally discharged." *Arnett* v. *Kennedy*, 416 U. S. 134, 185 (concurring in part and dissenting in part). See *id.*, at 170 (opinion of POWELL, J.,); *id.*, at 203 (Douglas, J., dissenting); *id.*, at 212–227 (MARSHALL, J., dissenting). And finally, in February 1976, more than a year and a half prior to appellee's termination, JUSTICE POWELL summarized for the Court fundamental legal principles whose sources could be traced to cases from the 19th century:

> "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. . . . This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. *Wolff* v. *McDonnell*, 418 U. S. 539, 557–558 (1974). See, *e. g.*, *Phillips* v. *Commissioner*, 283 U. S. 589, 596–597 (1931). See also *Dent* v. *West Virginia*, 129 U. S. 114, 124–125 (1889). The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' *Joint Anti-Fascist Comm.* v. *McGrath*, 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' *Armstrong* v. *Manzo*, 380 U. S. 545, 552 (1965). See *Grannis* v. *Ordean*, 234 U. S. 385, 394 (1914)." *Mathews* v. *Eldridge*, 424 U. S. 319, 332–333 (1976).

See also *Goss* v. *Lopez*, 419 U. S. 565 (1975); *Perry* v. *Sindermann*, 408 U. S. 593 (1972); *Fuentes* v. *Shevin*, 407 U. S: 67 (1972); *Stanley* v. *Illinois*, 405 U. S. 645 (1972); *Connell* v. *Higginbotham*, 403 U. S. 207 (1971) *(per curiam);*

*Wisconsin* v. *Constantineau*, 400 U. S. 433 (1971); *Goldberg* v. *Kelly*, 397 U. S. 254 (1970); *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969).

If there were any ambiguity in the repeated pronouncements of this Court, appellants had several other reasons to know that their failure to afford appellee meaningful pretermination notice and hearing violated due process. Two years prior to appellee's discharge, the Florida Attorney General explained in an official opinion that "[c]areer service employees who have attained permanent status in the career service system have acquired a property interest in their public positions and emoluments thereof—such as job security and seniority which they may not be deprived of without due process of law." Fla. Op. Atty. Gen. 075–94, p. 161 (1975). And more than a year before the events at issue here, in a case involving the Jacksonville, Fla., City Civil Service Board, the Court of Appeals for the Fifth Circuit left no doubt as to what it thought "clearly established" law required:

> "Where a governmental employer chooses to postpone the opportunity of a nonprobationary employee to secure a full-evidentiary hearing until after dismissal, risk reducing procedures must be accorded. These must include prior to termination, written notice of the reasons for termination and an effective opportunity to rebut those reasons. Effective rebuttal must give the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision." *Thurston* v. *Dekle*, 531 F. 2d 1264, 1273 (1976), vacated and remanded on other grounds, 438 U. S. 901 (1978).

Finally, some two months prior to appellee's discharge, the Florida Highway Patrol issued a regulation undoubtedly intended to conform administrative practice with decisions like

*Thurston.*[2]   The regulation, which has the force of statutory law, see 543 F. Supp., at 20, provides in pertinent part:

> "Upon receiving a report of . . . a violation of Department or Division rules and regulations . . . the Director shall order a complete investigation to determine the true facts concerning the circumstances surrounding the alleged offense.   The completed investigation report will also contain a written statement made by the employee against whom the complaint was made.   If after a thorough study of all information concerning the violation, the Director decides that a . . . dismissal will be in order, he will present the employee in writing with the reason or reasons for such actions."   General Order No. 43, § 1.C (Sept. 1, 1977), quoted in 543 F. Supp., at 19–20.

The Court ignores most of this evidence demonstrating the objective unreasonableness of appellants' conduct.   Instead, the Court relies first on *Weisbrod* v. *Donigan,* 651 F. 2d 334 (CA5 1981) *(per curiam),* as "authoritative precedent" for the proposition that appellee's right to pretermination notice and a hearing was not "well established in the Fifth Circuit at the

---

[2] Because I believe appellants were not entitled to qualified immunity under the standards set forth in *Harlow* v. *Fitzgerald,* 457 U. S. 800 (1982), I need not consider whether, as appellee contends, violation of the department regulation would defeat immunity for violating federal rights of which the officials had no reasonable knowledge.   It seems plain to me, however, that the existence of the regulation is relevant to the *Harlow* analysis.   Regardless of whether this Court or the Court of Appeals now thinks appellee's right to pretermination notice and hearing was not "clearly established" in 1977, the presence of a clear-cut regulation obviously intended to safeguard public employees' constitutional rights certainly suggests that appellants had reason to believe they were depriving appellee of due process.   Cf. *Harlow, supra,* at 821 (BRENNAN, J., concurring).   Such an objective basis of knowledge provides at least as reliable a measure of the reasonableness of official action as does a court's *post hoc* parsing of cases.   See 457 U. S., at 815–819.

time of the conduct in question." *Ante,* at 192. In *Weisbrod,* the Court of Appeals simply declared—without citation to any of the cases just discussed, including its own decision in *Thurston*—that "the record indicates defendants did not act in disregard of any well-settled constitutional rights" and that "Weisbrod offers no authority indicating the failure to hold a pretermination hearing and the delay in the process of her administrative appeal were clear violations of her constitutional rights." 651 F. 2d, at 336. It is unclear from the court's brief *per curiam* opinion whether Weisbrod—unlike appellee in this case—was informed prior to discharge that her conduct constituted grounds for termination. See *id.,* at 335. In any event, the Court of Appeals' dubious and cursory *ipse dixit* in *Weisbrod,* rendered four years after the conduct at issue in this case, is hardly persuasive, much less controlling, authority for this Court's decision that appellee's rights were not clearly established in 1977.

The other basis for the Court's rejection of appellee's claim is an assertion that it was not "unreasonable in this case, under Fourteenth Amendment principles, for the Department to conclude that appellee had been provided with the fundamentals of due process." *Ante,* at 192. The Court seeks to support this statement by relying on the fact that appellee had been told to discontinue his second job and that he "took advantage of several opportunities to present his reasons for believing that he should be permitted to retain his part-time employment . . . ." *Ibid.* Appellee did not, however, have an opportunity to present his reasons for retaining his civil service job with the Florida Highway Patrol—the employment in which he had a protected property interest. See 543 F. Supp., at 12. Indeed, he was, according to the District Court, never told that his Highway Patrol job was in jeopardy, and he never had a chance to try to persuade the relevant decisionmaker that the second job did not create a conflict of interest. The Court concedes that our decisions by 1978 had required notice and "'some kind of a hearing' . . .

prior to discharge of an employee who had a constitutionally protected property interest in his employment." *Ante*, at 192, n. 10. In this case, appellee received *no* meaningful notice and *no* kind of hearing before the official who fired him.

In sum, I believe that appellants' actions "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow*, 457 U. S., at 818, and I would therefore affirm the District Court's award of damages.