## Moore v. Hayman
*[Cite as 2 AOA 163]*

*Case No. 1-87-43*
*Allen County, (3rd)*
*Decided March 30, 1990*

*4th Amend. U.S. Const.*
*R.C. 9.86*

*Mr. Bernard K. Bauer, Attorney at Law, 410 W. Sandusky St., P.O. Box 932, Findlay, OH 45839, For appellant.*

*Mr. Anthony J. Celebrezze, Jr., Attorney General, Mr. Bennett A. Manning, State Office Tower, 26th Floor 30 E. Broad St., Columbus, OH 43215, For Appellees. George Walton, William Strauch, and James Randis.*

*Mr. Anthony J. Celebrezze, Jr., Attorney General, Mr. E. Dennis Muchnicki, Ms. Susan E. Ashbrook, State Office Tower, 17th Floor, 30 E. Broad St., Columbus, OH 43215, For Appellees, Edward Hayman and Paula Cotter.*

EVANS, J.

This is an appeal from a judgment of the Court of Common Pleas of Allen County granting the appellee's motion for a directed verdict against appellants James E. Moore and Donna M. Moore and dismissing their civil rights action.

Interdyne Corporation (Interdyne) was engaged in negotiations with the Ohio Environmental Protection Agency (EPA) and the Ohio Attorney General's Office regarding the disposal of hazardous waste materials which it was allegedly maintaining on the premises. Appellants James E. Moore (Mr. Moore) and Donna M. Moore (Mrs. Moore) were both employees of Interdyne. Mr. Moore was a truck driver and Mrs. Moore the company's secretary, bookkeeper and office manager.

On January 13, 1983, various state law enforcement personnel proceeded to secure a warrant pursuant to which they intended to search the Interdyne premises. There were essentially three agencies represented. Assistant Attorney General Edward D. Hayman represented the Ohio Attorney General's Office. The Ohio Bureau of Criminal Identification and Investigation was represented by Agents James Randas, William Jay Strauch and George Walton. The EPA was represented by Paula Cotter, Jerry Myers and Janet Badden. The entire group was accompanied by Allen County Sheriff's Deputy James Ketcham.

Upon obtaining the warrant the investigatory group proceeded to the offices of Interdyne's Trans-Vac division. They approached the door and, upon finding it locked, knocked loudly announcing their identity and their authorization to enter. Mr. Moore along with Gary Stowe, the general manager of Trans-ac, and Dan Lucke, employee and son of the owner of Interdyne, had departed a few minutes earlier to inspect one of Interdyne's job sites. Mrs. Moore was alone and unsure of what to do. She was instructed to either open the door or they would break it in. She opened the door and permitted them all to enter and radioed her superiors to return immediately.

When the group entered they were accompanied by a photographer from the *Lima News* who began taking pictures immediately. After being instructed by Assistant Attorney General Hayman that they need not extend any courtesies to Mrs. Moore the group proceeded through the building. They searched and seized numerous files and documents as well as extracting physical samples from storage drums located outside the facility.

The Moores were instructed that they could not leave the premises, even when they asked if they could get some lunch. They were required, over their protests, to submit to photographs of themselves holding cards which contained the listing of personal information such as name, address, social security number, birth date and race, all which was taken from their drivers licenses. Mr. and Mrs. Moore concede that they were not physically touched or harmed in any way during the incident, nor were they threatened with any such contact. However, they claim they were treated very abruptly and rudely, detained against their will and required to provide information and submit to photographs of themselves resembling mug shots, which they claim impinged upon their right to privacy. They also claim this entire incident and the publicity arising from it greatly embarrassed both the Moores and their families throughout the community. In sum, the parties claim they were very frightened and have not been able to enjoy their work as they once did.

This action was commenced on January 13, 1984 wherein Mr. and Mrs. Moore sought money damages for the alleged violations of Section 1983, Title 42, U.S. Code in the commission of the intentional torts of unlawful detention and invasion of privacy, against all of the members of the investigatory group in both their official and individual capacities.

On September 9, 1987, the action came on for jury trial, at which time defendants Janet Badden, Maury Walsh and Jerry Myers were voluntarily dismissed. At the close of plaintiff's case, defendants moved for a directed verdict. By judgment entry filed September 17, 1987 the trial court granted the motion and directed a verdict against Mr. and Mrs. Moore and dismissed the action.

It is from this judgment that the Moores appeal submitting one assignment of error as follows:

"THE TRIAL JUDGE ERRED, AS A MATTER OF LAW, BY DIRECTING A VERDICT OF DISMISSAL AT THE CLOSE OF THE PLAINTIFF'S CASE IN FAVOR OF EDWARD D. HAYMAN, WILLIAM JAY STRAUCH, JAMES RANDAS, GEORGE WALTON AND PAULA COTTER AND AGAINST PLAINTIFFS."

In support of their assignment of error appellants submit four issues for the court's consideration as follows:

"1. Are employees of the State entitled to qualified immunity, when acting under color of state of law, if the evidence offered by the plaintiffs in an action brought pursuant to Title 42 U.S.C. Section 1983 discloses that (1) such defendants departed from generally accepted standards of practice; (2) they should have known at the time they acted that they were departing from

generally accepted standards of practice; (3) their conduct was, in probability, actuated by ulterior motives; and (4) their conduct was in reckless disregard of the constitutional rights of the plaintiffs? * * *

"2. Do employees of a business surrender their right to expect that they will not be unlawfully detained and their right to privacy by merely being present when a search is conducted upon their employer's premises? * * *

"3. Are employees of the State of Ohio entitled to immunity under Revised Code Section 9.86, for common law torts, if the evidence offered by the plaintiffs discloses that the conduct of such defendants was, in probability, actuated by ulterior motives and that such conduct was in reckless disregard of the constitutional rights of the plaintiffs? * * *

"4. May an attorney-at-law employed in the enforcement section of a State agency, who participates in the execution of a search warrant, be held legally accountable for constitutionally impermissible conduct of other state employees committed in the presence of such attorney when such attorney is acting in concert with the other state employees and occupies a position of responsibility? * * *

Issues two (2), three (3) and four (4), their resolution being dependent upon the resolution of issue one (1), will be consolidated for review.

The constitutional rights of the citizenry and the latitude to be afforded public officials for the effective performance of their discretionary functions have always coexisted in a state of flux. Accordingly, our task herein is largely to maintain the balance between the two competing interests so as to allow public officials to continue to anticipate when their conduct may give rise to civil liability, while preserving a citizen's ability to vindicate his constitutional rights. See, *Davis* v. *Scherer* (1984), 468 U.S. 183.

Public officials, though acting pursuant to a valid warrant, may nonetheless be subject to civil liability under Section 1983, Title 42, U.S. Code, where the execution of such warrant is conducted in an unreasonable manner. See, *United States* v. *Murrie* (C.A 6 1976), 534 F. 2d 695; *Duncan* v. *Barnes* (C.A. 5 1979), 592 F. 2d 1336.

However, public officials are nonetheless protected from civil liability by qualified immunity where applicable. *Harlow* v. *Fitzgerald* (1982), 457 U.S. 800.

In *Anderson* v. *Creighton* (1987), 97 L. Ed. 2d 523, 524, the United States Supreme Court found that:

"[p]ublic officials, including state and federal law enforcement officers, are immune from personal liability for their allegedly unlawful official actions unless the law clearly proscribes the actions they took; * * *".

The actions allegedly taken by government officials must be assessed in light of the legal rules that were clearly established at the time. *Anderson, supra.* As of yet the United States Supreme Court has not defined the phrase "clearly established". However, in *Robinson* v. *Bibb* (C.A. 6 1988), 840 F. 2d 349, 351, the court held that, "in order to be clearly established, a question must be decided either by the highest state court in the state where the case arose, by a United States Court of Appeals or by the Supreme Court. *Wallace* v. *King* (C.A. 4 1980), 626 F. 2d 1157, 1161, certiorari denied, 451 U.S. 969, * * *".

Appellants introduced expert testimony as to generally accepted standards, for police officers and the appellees' deviance therefrom. However, such is not the appropriate standard to be applied. Rather, this inquiry is one of "objective legal reasonableness". *Harlow, supra* at 819. More specifically, in light of the legal rules clearly established at the time, did the public official know or have reason to know that his actions were in violation of constitutional right. The qualified immunity provided will shield "all but the plainly incompetent or those who knowingly violate the law". See, *Malley* v. *Briggs* (1986), 475 U.S. 335, 341.

In application to the instant case, it must be demonstrated that the investigatory group either knew or had reason to know that their actions were unlawful. This is not to say that appellants must cite a case specifically stating that the actions taken by the investigatory group were per se unlawful. Rather, given the legal rules of the day it must be demonstrated that they either knew or should have known that their actions were clearly unlawful.

This civil rights action against state law enforcement authorities arose out of the execution of a search warrant on the premises where the appellants were employed. Appellants argue generally that two specific acts of appellees were unlawful, the approximately four (4) hour detention during which the search was conducted and the taking of the appellant's photographs with personal information from their drivers licenses recorded, all of which occurred against the will of the appellants.

Concededly, there is no case law which states that as a legal principle either one of these

actions was unlawful. Appellants premise their argument on the recitation of the various cases and statutes which expressly allow the detention of individuals in specific situations, thus negatively implying that the actions of the appellees, not being expressly lawful, were implicitly unlawful.

We disagree. To adopt this argument would establish an excessively vague standard which would make it increasingly difficult for public officials to know what actions would or would not subject them to liability, which was one of the principle purposes for the adoption of the qualified immunity standard as articulated in *Harlow, supra.*

Additionally, in *Michigan* v. *Summers* (1981), 452 U.S. 692, the United States Supreme Court held that:

"[f]or Fourth Amendment purposes, * * * a warrant to search for contraband founded on probable cause implicitly carries with it the unlimited authority to detain the occupants of the premises while a proper search is conducted."

In so holding, the court expressly declined to consider whether this analysis is applicable to a warrant authorizing a search for evidence rather than contraband. *Michigan* v. *Summer,*

*supra* at fn. 20. Therefore, it is apparent that it is unclear whether the appellees' actions were in violation of a constitutional right at all, let alone one so clearly established as to give rise to civil liability. Due to the fact that no clearly established constitutional right was violated, therefore shielding the appellees with qualified immunity, appellants' issues two (2), three (3) and four (4) become irrelevant.

Construing the evidence most strongly in favor of the Moores, we are unable to discern any determinative issue upon which reasonable minds could come to more than one conclusion. Appellants have failed to demonstrate the violation of any constitutional right, let alone one which has been clearly established.

Appellants' assignment of error is not well taken and is therefore overruled.

Having found no error prejudicial to the plaintiffs-appellants herein, in any of the particulars assigned and argued, the judgment of the trial court is affirmed.

*Judgment affirmed.*

SHAW, P.J. and MILLER, J., Concur.