14 F.Supp.2d 424 (1998)
NEW YORK STATE NATIONAL ORGANIZATION FOR WOMEN, et al., on behalf of themselves, their members, and all others similarly situated, and Clarice Seegars, Jane Doe, Dellie Britt and Bernadette Thomas, on behalf of themselves, and all others similarly situated, Plaintiffs-Intervenors,
v.
Mario CUOMO, individually and as former Governor of the State of New York, Margarita Rosa, individually and as former Commissioner of the Division of Human Rights of the Executive Department of New York State, George Pataki, individually and as Governor of the State of New York, and Edward Mercado, individually and as Commissioner of the Division of Human Rights of the Executive Department of New York State, Defendants.
No. 93 Civ. 7146(RLC).
United States District Court, S.D. New York.
July 24, 1998.
*425 *426 Raff & Becker, LLP, New York City, David Raff, Robert L. Becker, of counsel, Greater Upstate Law Project, Rochester, NY, Steven L. Brown, Robert F. Graziano, of counsel, Law Offices of Allison Berry, White Plains, NY, Allison Berry, of counsel, Law Offices of Gerald J. Dunbar, Brooklyn, NY, Gerald J. Dunbar, of counsel, for plaintiffs.
Attorney General of the State of New York, New York City, Dennis Vacco, June Duffy, of counsel, for defendants.

OPINION
ROBERT L. CARTER, District Judge.
This is a class action against defendants arising from constitutional violations allegedly committed by the New York State Division of Human Rights ("SDHR" or the "Division"). The plaintiffs-intervenors seek a declaratory judgment, injunctive relief, and damages.
Defendants now move to dismiss the damage claims, pursuant to Rule 12(c), F.R.Civ. P., on grounds of qualified immunity. Alternatively, defendants ask the court to dismiss the damage claims asserted against defendant Mercado ("Mercado") under the doctrine of absolute legislative immunity.

I. Background
The background of this controversy is set forth in a previous opinion of this court, New York State Nat'l-Org. for Women v. Cuomo, No. 93 Civ. 7146, 1998 WL 157029 (S.D.N.Y. Apr.3, 1998) (Carter, J.), with which familiarity is assumed.
The present motion is made in response to the court's opinion of April 3, 1998, granting, inter alia, plaintiffs-intervenors' I motion for leave to amend the complaint by adding claims against the defendants in their personal capacities. Cuomo, 1998 WL 157029 at *5.
On April 3, 1998, and April 6, 1998, the plaintiffs-intervenors filed amended and supplemental complaints. These complaints included claims against the defendants in their individual capacities on the grounds that the defendants are and were aware that the practices challenged in this suit violate(d) the constitutional rights of the plaintiffs-intervenors. (NOW Cmplt. at ¶¶ 30-35, 37-47, 50-51, 53; Seegars Cmplt. at ¶¶ 29-34, 36-45).
The plaintiffs-intervenors' damage claims are based on New York Executive Law (the "Human Rights Law"), which permits any person claiming to be aggrieved by an unlawful discriminatory practice to file a complaint with the SDHR, and which provides an administrative process for resolving complaints of discriminatory practices within specific time periods. (NOW Cmplt. at ¶¶ 18-28; Seegars Cmplt. at ¶¶ 22-28). Plaintiffs-intervenors argue that this law creates an entitlement that constitutes a property right that is protected by the Fourteenth Amendment. (NOW Cmplt. at ¶ 28; Seegars Cmplt. at ¶ 28).[1] Specifically, the amended and supplemental complaints allege that the defendants have violated the due process and equal protection rights of the plaintiffs-intervenors by
permitting protracted administrative delays in the processing, investigation, and resolution of unlawful discrimination complaints, so egregious that their rights established by the state [pursuant to the Human Rights Law] may be extinguished, by, among other things, dismissal of their cases, because of prejudice to respondents, as a matter of law or fact, and dismissal because the delays have impaired and impeded their ability to prosecute or prove all or part of their claims.
(NOW Cmplt. at ¶ 3; Seegars Cmplt. at ¶ 3); see also (NOW Cmplt. at ¶¶ 4, 28; Seegars Cmplt. at ¶ 7, 8, 28). Additionally, plaintiffs-intervenors claim that Mercado has violated their rights under the Supremacy Clause by "promulgating and implementing new rules *427 and regulations which authorize employees of SDHR to refuse to accept complaints of aggrieved persons alleging unlawful discriminatory conduct under the Human Rights Law...." (NOW Cmplt. at ¶ 28).
Defendants claim that they were and are unaware that the practices challenged in this suit violate(d) the constitutional rights of the plaintiffs-intervenors. (Defs.' Mem. of Law at 2). Therefore, they argue, they are entitled to qualified immunity from the damage claims brought against them by the plaintiffs-intervenors as a matter of law. Id. Defendants also argue that Mercado is entitled to absolute legislative immunity from the damage claims as a matter of law because of the protection afforded to public officials acting in a legislative capacity. Id.

II. Analysis

A. Relevant Standard
In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court ruled that a government official who is sued in his individual capacity is entitled to qualified immunity from liability for civil damages if the alleged unlawful conduct did not violate "clearly established constitutional or statutory rights." Id. at 818, 102 S.Ct. 2727.
The standard established in Harlow is an objective one. Id. at 818-19, 102 S.Ct. 2727. Whether the relevant law is clearly established does not turn on an official's state of mind or subjective belief. See e.g. Crawford-El v. Britton, ___ U.S. ___, 118 S.Ct. 1584, 1592, 140 L.Ed.2d 759 (1998) ("Evidence concerning the defendant's subjective intent is simply irrelevant to [the qualified immunity defense]."). Rather, the court must ascertain whether "in light of pre-existing law the unlawfulness [of the alleged conduct] is apparent." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); see also Crawford-El, ___ U.S. at ___, 118 S.Ct. at 1593 ("[I]t is not unfair to hold liable the official who ... should know he is acting outside the law.") (quoting Butz v. Economou, 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). To grant qualified immunity "no rational jury could fail to conclude that it was reasonable" for the defendant officials to believe that their conduct was lawful. LaBounty v. Coughlin, 137 F.3d 68, 74 (2d Cir.1998) (internal quotation marks omitted). Thus, in qualified immunity analysis, the court's inquiry consists of a determination as to whether a defendant official reasonably could have expected that his action was consistent with established legal principles, or conversely, whether he reasonably should have known that his action was taken in disregard of the law. See Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); Davis v. Scherer, 468 U.S. 183, 194-96, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); Crawford-El, ___ U.S. at ___, 118 S.Ct. at 1597.
The court's evaluation of whether relevant law is "clearly established" is made on the basis of Supreme Court precedent and the law of this circuit. See Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (citing Davis, 468 U.S. at 192, n. 9, 104 S.Ct. 3012); see also Russell v. Scully, 15 F.3d 219, 223 (2d Cir.1993). Although violation of state rules or regulations may inform the court's analysis of a qualified immunity defense, the defense may only be defeated by the court's determination that the official violated "clearly established" federal law. See Davis, 468 U.S. at 193-96 & n. 14, 104 S.Ct. 3012.

B. Application of the Standard
The parties disagree fundamentally on the threshold question of what law governs the conduct challenged in this litigation. Thus, initially the court must determine what law is applicable to the case. See Harlow, 457 U.S. at 808, 818, 102 S.Ct. 2727 ("[T]he judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.").
The defendants' definition of plaintiff's-intervenors' claims, and thus the rights at issue, is exceedingly specific. They cite a single case, Polk v. Kramarsky, 711 F.2d 505 (2d Cir.), cert. denied, 464 U.S. 1000, 104 S.Ct. 505, 78 L.Ed.2d 695 (1983), as controlling *428 authority, (Defs.' Mem. of Law at 12), claiming that Polk stands for the proposition that SDHR's delay in processing complaints cannot constitute a Fourteenth Amendment violation if an avenue remains (at SDHR or another tribunal) through which a claimant can pursue his discrimination complaint. (Defs.' Mem. of Law at 12).
In Polk the appellant argued that SDHR's seven year delay in processing his employment discrimination claim, which had been deferred to the agency by the Equal Employment Opportunity Commission ("EEOC)," gave rise to a claim under the state's Human Rights Law, 42 U.S.C. § 1983, and Title VII, 42 U.S.C. § 2000e, for violation of his Fourteenth Amendment right to due process. In support of his claim, the appellant relied primarily upon Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), in which the Supreme Court held that the right to use a state's adjudicatory procedures was a form of property that could not be "finally destroy[ed] without first giving the putative owner the opportunity to present his claim of entitlement." Id. at 431, 102 S.Ct. 1148.
The Second Circuit ruled that Polk's due process rights had not been violated by the Division's delay because his action had survived, albeit long delayed. Polk, 711 F.2d at 509. The Court reached this conclusion because Polk had brought a Title VII action against his former employer, then pending in federal court: given the pending claim, Polk could not logically claim that he had actually been prejudiced by the Division's conduct. Id. That is, Polk was not in the position to establish actual prejudice prior to learning the outcome of the Title VII case. Id. Therefore, the Court held, the principle enunciated in Logan was inapplicable. Id. at 508-09. For whereas Logan involved a "state law [that] completely deprived a claimant of an opportunity to pursue a discrimination claim," Polk's property interest had not been altogether destroyed. Id. Thus, it was unclear whether he had suffered as a result of SDHR's actions.
Noting the significance that the Second Circuit placed on Polk's inability to demonstrate actual prejudice to his discrimination claim, plaintiffs-intervenors argue that Polk is distinguishable from this case. Unlike Polk, many of their state law claims "have been finally destroyed, in whole or in part"; or the Division's policies and practices have placed their claims in a "zone of risk whereby they face complete or partial extinguishment of all or part of their claim." (Plfs.' Mem. of Law at 7).
One point of consensus is apparent from the parties' submissions: that in the Second Circuit it is "clearly established" law that the Division's complete destruction of a party's right to pursue a discrimination claim would constitute a Fourteenth Amendment violation. (Defs.' Mem. of Law at 12; Plfs.' Mem. of Law at 9-10). Proceeding from this consensus to ascertaining what law governs qualified immunity analysis, the court finds that important distinctions exist among the members of the plaintiff-intervenor class. These distinctions relate to the basis upon which, or whether, the Division has disposed of the discrimination complaints that these individuals brought pursuant to the Human Rights Law.

1. Cases to Which Polk Applies
Upon review of the record in this case, the court concludes that the claims of some plaintiffs-intervenors have not been destroyed by the Division's practices. These include all claims that currently are pending before SDHR, whether initiated before or after SDHR's new intake procedures were promulgated (that is, either prior to or after November 3, 1995). These claims also include those that were dismissed for "failure to cooperate."

a. Pending Cases
For plaintiffs-intervenors whose claims fall into the "pending" category, the possibility continues to exist that the claims that they have brought pursuant to the Human Rights Law will be investigated, and that they can be made whole by injunctive relief or damages. Like the appellant in Polk, these parties continue to have an avenue through which to pursue their complaints (i.e. SDHR). See Polk, 711 F.2d at 509. Therefore, their claims cannot be deemed "extinguished." *429 Thus, Polk governs the disposition of the claims of these individuals.
Defendants are entitled to qualified immunity against the damage claims of this category of the plaintiff-intervenor class even though precedent may exist that suggests that the protections afforded by the Fourteenth Amendment may attach prior to the final destruction of a property interest. (Plfs.' Mem. of Law at 9, n. 5)(citing, for example, Connecticut v. Doehr, 501 U.S. 1, 12, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991); Buchanan v. Warley, 245 U.S. 60, 74, 38 S.Ct. 16, 62 L.Ed. 149 (1917)). In fact, precisely because the Second Circuit's ruling in Polk contravenes this line of cases, defendants' qualified immunity defense is strengthened. Polk necessarily implies that applicable law in this Circuit is not clear on the question of whether conduct by the Division that nearly destroys, but does not actually destroy a claimant's opportunity to be heard, violates due process. In other words, in this Circuit the distinction that Polk made to Logan v. Zimmerman, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), controls the result for those who may still obtain relief. See Polk, 711 F.2d at 509 ("Here, Polk's right of action has survived, albeit long delayed. Logan is therefore distinguishable.").

b. Cases Dismissed for "Failure to Cooperate"
"Failure to cooperate" dismissals resulted from parties' failure to respond to the Division's requests for information or to appear for a scheduled appointment. See Barbara Riley Shaw & Lawrence A. Wizman, N.Y. State Div. of Human Rights, Bureau of Regional Affairs Standard Operating Procedures (April, 1993). Thus, these complainants bear responsibility for the Division's action regarding their claims and cannot make a credible case of suffering actual prejudice as a result of the Division's practices and policies.
Similar to those whose claims are pending before SDHR, the classes of individuals in this category are controlled by Polk, and under the objective test established by Harlow, 457 U.S. at 818-19, 102 S.Ct. 2727, the defendants are entitled to qualified immunity against the claims of these individuals.

2. Cases to Which Polk Does Not Apply
Unlike the appellant in Polk, certain plaintiffs-intervenors no longer are able to pursue the complaints that they brought pursuant to the Human Rights Law. These parties may include, but may not be limited to those whose complaints were dismissed for "failure to locate," by court order due to the Division's delay in processing them, because of respondents' bankruptcy, or by staff prior to "probable cause" hearings.
Because these parties may be able to demonstrate at a trial on the merits that they actually have been prejudiced by SDHR's dilatory or arbitrary practices and policies, they assert a different claim than the appellant in Polk. Whereas Polk continued to have an avenue for pursuing his discrimination claim despite the Division's delay in processing his claim, the Division's delay or arbitrary decision making may have altogether extinguished their ability to pursue their rights under the Human Rights Law. In this way, the claims of these parties are factually distinguishable from that asserted in Polk, rendering Polk inapplicable to the court's analysis of whether these individuals may sue defendants for damages.

a. The Applicable Standard
The Supreme Court's ruling in Logan v. Zimmerman Brush Co., 455 U.S. at 434, 102 S.Ct. 1148, that "the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement" controls the court's qualified immunity analysis regarding the damage claims of these parties. The question before the court is whether, under the objective standard established in Harlow v. Fitzgerald, 457 U.S. at 818-19, 102 S.Ct. 2727, the defendants should have known that the policies and practices that may have resulted in actual prejudice to and extinguishment of these parties' claims under the Human Rights Law were unlawful under Logan.
Claiming that Logan is factually distinguishable from the scenario presented here and that its holding is "too generalized" to *430 control the outcome of this case, defendants rely upon two district court cases to support their contention that Polk is dispositive of the issues raised in the instant action, (Defs.' Mem. of Law at 13-14) (citing Baba v. Warren Management Consultants Inc., 882 F.Supp. 339, 342 (S.D.N.Y.) (Batts, J.), aff'd 89 F.3d 826, 1995 WL 722242 (2d Cir.1995); Moore v. United States, 609 F.Supp. 682, 684 (E.D.N.Y.1985)), as well as state law that stands for the proposition that "without the gravest actual prejudice, delays did not deprive litigants before the agency of due process of law." (Defs.' Mem. of Law at 14)(citing Diaz Chemical v. New York State Div. of Human Rights, 91 N.Y.2d 932, 670 N.Y.S.2d 397, 693 N.E.2d 744 (1998)).
State law does not control the court's analysis of the Fourteenth Amendment due process issues presented here, however. See 28 U.S.C. § 1652 (1994) ("The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil cases in the courts of the United States, in cases where they apply"); Vitek v. Jones, 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) ("[M]inimum requirements [of procedural due process] being a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action."); Cohen v. Beneficial Indus. Loan Co., 337 U.S. 541, 547, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) ("[A] federal court would not give effect, in either a diversity or nondiversity case, to a state statute that violates the Constitution of the United States."). The court must look to Supreme Court and Second Circuit precedent in evaluating whether the law relevant to the constitutional issues raised here is "clearly established" for qualified immunity purposes. See Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (citing Davis v. Scherer, 468 U.S. 183, 192, n. 9, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) Russell v. Scully, 15 F.3d 219, 223 (2d Cir.1993)).
Based upon the Supreme Court's decision in Logan, the court finds that the reasonable government official should have known that the Division's actions violated the Fourteenth Amendment rights of the categories of plaintiffs-intervenors delineated supra, page 429.[2] First it is important to note that Logan and the instant action involve the same kind of underlying state law claim. At issue in Logan was an appellant's employment discrimination claim, which was brought pursuant to the Illinois Fair Employment Practices Act ("FEPA") and filed with the Illinois Fair Employment Practices Commission ("FEPC"). The FEPA, which bars, inter alia, discrimination in real estate and financial transactions, as well as in public accommodations and employment, Logan, 455 U.S. 422, 425 & n. 1, 102 S.Ct. 1148, 71 L.Ed.2d 265 (citing Ill.Rev.Stat., ch. 48, ¶ 851 et seq. (1979), amended by 1980 Ill.Laws, P.A. 81-1267) is analogous to the New York Human Rights Law, which also bars, inter alia, discrimination by real estate agents and in the application for and extension of credit, as well as in public accommodations and employment. See N.Y.Exec.Law, Art. 15, § 296 (McKinney's 1993). Moreover, SDHR is analogous to the FEPC.[3] Therefore, the Court's holding in Logan that the FEPC could not prevent Logan from pursuing his claim under the FEPA without according him due process of law should apply equally to the SDHR and claims brought by parties pursuant to the Human Rights Law.
Logan also controls the instant action for qualified immunity purposes because the manner in which the FEPC prevented Logan *431 from asserting his rights under the FEPA is analogous to the manner in which the parties in the instant action allegedly are denied their ability to proceed under the Human Rights Law. That is, Logan argued that the FEPC's dismissal of his FEPA claim because of its own failure to convene a timely fact-finding conference for the collection of evidence violated his Fourteenth Amendment Rights. Logan, 455 U.S. at 427, 102 S.Ct. 1148. Ruling on Logan's behalf, the Court held that the cause of action created by the FEPA could not be destroyed by the state  due to inadvertent delay or any other policy or practice  without giving Logan an opportunity to present his claim of entitlement. Id. at 433, 102 S.Ct. 1148. Similarly, Logan implies that the SDHR cannot thwart the investigation or resolution of claims brought pursuant to the Human Rights Law  whether by delay or any other means.

b. Other Relevant Precedent
Although Logan is a sufficient basis for the court's finding that the law relevant to this action was clearly established for purposes of evaluating defendants' qualified immunity defense, other relevant precedent supports this conclusion. Well-established case law concerning whether administrative delay that results in arbitrary decision may violate a party's constitutional rights also compels the conclusion that defendants should have known that the Division's practices were inconsistent with federal due process norms. This jurisprudence stands commandingly for the proposition that administrative delay in decision making processes that prejudices a citizen's substantive constitutional or statutory rights may violate the due process clause.
While there is "no bright-line rule ... for determining when a delay is so burdensome as to become unconstitutional," Kraebel v. New York City Dept. of Housing Preservation and Development, 959 F.2d 395, 405 (2d Cir.1992), the Supreme Court acknowledged as early as 1926 that delay is an element to be considered by courts in evaluating the constitutionality of administrative procedures that affect substantive rights. See Smith v. Illinois, 270 U.S. 587, 591, 46 S.Ct. 408, 70 L.Ed. 747 (1926) ("Property may be as effectively taken [in violation of the Fourteenth Amendment] by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them...."); see also Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (requiring notice and "opportunity to be heard" before seizure of property). An even stronger early formulation of the principle that delay is relevant to Fourteenth Amendment analysis appeared in Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), in which the Court held that the due process clause requires the opportunity to be heard "at a meaningful time and in a meaningful manner."
The criterion of delay then was incorporated into the familiar balancing test established by Court in Mathews v. Eldridge, 424 U.S. 319, 341, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for evaluating the procedural constraints imposed upon officials by the Fourteenth Amendment. ("`[T]he possible length of wrongful deprivation ... is an important factor in assessing the impact of federal action on the private interests,'"). Id. at 341, 96 S.Ct. 893 (quoting Fusari v. Steinberg, 419 U.S. 379, 389, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975)); see also id. at 333, 96 S.Ct. 893 ("The fundamental requirement of due process is the opportunity to be heard `at a meaningful time and in a meaningful manner.'") (quoting Armstrong, 380 U.S. at 552, 85 S.Ct. 1187). Moreover, in 1979 the Court held that delay constitutes a violation of due process at a definable point, Barry v. Barchi, 443 U.S. 55, 66, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), by explicating the concept of "meaningful time." "To be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided. ..." Id. at 74, 99 S.Ct. 2642. See also Cleveland Brd. of Educ. v. Loudermill, 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse federal action") (quoting Vitek *432 v. Jones, 445 U.S. 480, 491, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)).
The Second Circuit has followed the Court's analysis of the potential due process consequences of delay. See Kraebel v. New York City Dept. of Housing Preservation and Development, 959 F.2d 395, 405 (2d Cir. 1992) ("`[I]mplicit in the conferral of an entitlement is a further entitlement, to receive the entitlement within a reasonable time.'") (quoting Schroeder v. City of Chicago, 927 F.2d 957, 960 (7th Cir.1991)); Kraebel, 959 F.2d at 405 ("[D]elay in processing can become so unreasonable as to deny due process."); Isaacs v. Bowen, 865 F.2d 468, 477 (2d Cir.1989); United States v. Laurenti, 581 F.2d 37, 42 n. 15 (2d Cir.1978) ("[i]n civil cases, failure to provide a prompt hearing as to the property seized raises due process considerations"); G.I. Distributors v. Murphy, 469 F.2d 752, 756-57 (2d Cir.1972) (holding that administrative delay in granting hearing after seizure of magazines was not extended and thus did not violate due process) (citing United States v. Thirty-Seven Photographs, 402 U.S. 363, 373, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) (plurality) (reading into 19 U.S.C. § 1305(a) a requirement that forfeiture proceedings be commenced within 14 days and completed in 60 days of their commencement)).[4]
As the leading case on the procedural constraints generally imposed by the Fourteenth Amendment, Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), provides particularly important guidance in assessing the strength of defendants' qualified immunity defense. In Eldridge the Supreme Court established a balancing test for evaluating officials' obligations under the Fourteenth Amendment. The Eldridge test directs courts to consider three factors when determining whether administrative procedures are constitutionally adequate. These include the governmental interest in using the procedure in question; the private interest affected by the procedure; and the risk of an erroneous deprivation of the private interest imposed by use of the challenged procedure, along with the probable value of substitute or additional procedural safeguards. Id. at 335, 96 S.Ct. 893.
Significantly, the Division's interest in using the procedures challenged by plaintiffs-intervenors in the case at bar is unclear at best, and at worse, unconvincing. No adequate justification has been offered by the Division for its use of the challenged policies and practices, New York State Nat'l-Org. for Women v. Cuomo, No. 93 Civ. 7146, 1998 WL 157029 at *10, *12 (S.D.N.Y. Apr.3, 1998) (Carter, J.) (rejecting justification of procedures on grounds that they protect against "vexatious and unnecessary governmental investigation"), although defendants have offered the standard rationales for pursuing a qualified immunity defense to the damage claims arising from them. (Defs'. Mem. of Law at 6-7) (citing Harlow v. Fitzgerald, 457 U.S. 800, 817-18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (qualified immunity protects against "costs associated with the defense of damage actions" and shields officials from "baseless lawsuits"); Crawford-El v. Britton, ___ U.S. ___, ___, 118 S.Ct. 1584, 1593, 140 L.Ed.2d 759 (1998) ("social costs" of subjecting officials to damages liability include "diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office")). In fact, the record shows that on several occasions New York state officials themselves have criticized the policies and practices that form the basis of this action.
In the Division's 1984 Annual Report to the Governor, Commissioner Douglas White, referring to the backlog wrote, "... the Division believes strongly that `justice delayed is justice denied,' and raises fundamental due process issues." ... Defendant Rosa, in commenting on the elimination of positions created to reduce the Division's case backlog wrote, "... justice for complainants would be delayed to *433 the point of making a mockery of our purposes, and the agency would rightfully be publicly viewed as an ineffective forum for receiving any meaningful redress." ... [I]n 1993 defendant Cuomo, in referring to the initiation of a mediation program by the Division stated: "When someone has felt the sting of discrimination, justice delayed can be justice denied."
(Plfs.' Mem. of Law at 4, n. 1) (citations omitted).
Moreover, the state law reporters abound with pronouncements by judges that SDHR's delays in processing discrimination complaints are unreasonable, even though they have not found the Division's practices unlawful under New York law.
This Court [] ... rightly decries, once again, the persistently inordinate delays in [SDHR's] discharge of its duties to investigate and resolve discrimination claims.... [SDHR's] well-intentioned but embarrassing yearnings [to improve the systemic problem] continue to resound entirely hollow, however, against the thump of the empirical facts and trend lines. They are worsening ... so the assurances lack any track record on which to peg reliability.
See Diaz v. New York State Div. of Human Rights, 91 N.Y.2d 932, 934, 670 N.Y.S.2d 397, 693 N.E.2d 744 (N.Y.Ct.App.1998) (concurrence); id. at 933, 670 N.Y.S.2d 397, 693 N.E.2d 744 ("[W]e reiterate our serious concern about the negative systemic effects of the agency's protracted delays."); Corning Glass Works v. Ovsanik, 84 N.Y.2d 619, 622, 620 N.Y.S.2d 771, 644 N.E.2d 1327 (1994) (8 1/2 year delay in processing complaint was "inordinate"); cf. Polk v. Kramarsky, 711 F.2d 505, 507 (2d Cir.1983) ("[I]t is clear that the more than seven-year period between the filing of the complaint ... and its ultimate dismissal violated both the spirit and the letter of the procedural provisions [of the Human Right Law that set directory time limits]"). Thus, far from being justified, the policies and practices at issue in this case are believed indefensible by many significant parties. Under these circumstances, the government's interest in using the challenged procedures is weak.
The private interest affected by the Division's practices is that involved in deterring and being free of discrimination that is shared by the plaintiffs-intervenors and society, generally. In fact, this interest is a bedrock constitutional principle, a right protected by federal statutory and constitutional law, as well as the state constitution and statutes at issue in this case. See e.g. U.S. CONST. amend. XIV, § 2 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."); 42 U.S.C. § 1983 (1988) ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.") N.Y. CONST. art. 1, § 11 (1982) ("No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state."); N.Y.Exec.Law, § 291(1) (McKinney's 1993) ("The opportunity to obtain employment without discrimination because of age, race, creed, color, national origin, sex or disability or marital status is hereby recognized as and declared to be a civil right."). Given the numerous sources of authority upon which the private interest asserted here is based, it is obviously a powerful one.
That the private interest is strong and the countervailing governmental interest is comparatively weak is made evident by statistics revealing the average amount of time that the Division takes to process complaints, Cleveland Brd. of Educ. v. Loudermill, 470 U.S. 532, 557, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1984) ("[T]he constitutional analysis of delay requires some development of the relevant factual context when a plaintiff alleges ... that the administrative process has taken longer than some minimal amount of time."), which brings us to a consideration of the third Eldridge factor. These statistics demonstrate that the social costs of the Division's *434 practices are substantial and permanent, in many instances.
According to the record, the Division dismissed 5,152 for administrative convenience ("AC'd") for failure to locate, failure to cooperate and bankruptcy of the respondent between October 15, 1990 and April 10, 1998. (Plfs.' Mem. of Law at 12). Of that number, 2,624, or 51%, were AC'd three or more years after their complaints had been filed. Id. The mean and median number of days from date of filing to date of closing for failure to locate was 1,197 and 1,151 days, respectively, with the longest number of days elapsed being 6,314. Id. For cases closed because of bankruptcy, the mean and median number of days elapsed was 1,057 and 1,036, respectively, with the longest number of days elapsed being 4,838 days. Id. Some cases were dismissed under these categories after a probable cause hearing. The mean and median number of days elapsed with respect to these cases were 2,585 and 2,635, respectively, with 5,585 being the most days elapsed. Id. For cases closed at the hearing level for bankruptcy, the mean and median number of days elapsed was 2,233 and 2,249, respectively, with the longest number of days elapsed being 4,365. Id. at 13.
Under these circumstances, the risk to citizens of erroneous deprivation of rights that is occasioned by the Division's policies and practices, and the value of using different procedures, is clear. The delays in resolving and ultimate dismissal of thousands of complaints represent opportunities lost for thousands of citizens to pursue their substantive rights under the Human Rights Law. For these individuals, SDHR's policies and practices are likely to have caused irreparable harm. See New York State Nat'l-Org. for Women v. Cuomo, No. 93 Civ. 7146, 1998 WL 157029 at *7, *12 (S.D.N.Y. Apr.3, 1998) (Carter, J.). Thus, these delays and dismissals have undermined the legislature's purpose in enacting the Human Rights Law and the directory time periods, Sarkisian Brothers Inc. v. State Div. of Human Rights, 48 N.Y.2d 816, 818, 424 N.Y.S.2d 125, 399 N.E.2d 1146 (1979), contained in those laws for investigating and resolving citizens' complaints. The Division's practices show disregard for the legislature's intent that discrimination complaints brought under the Human Rights Law be resolved promptly, or within one year and three months of their filing. See N.Y.Exec.Law §§ 297(2)(a), (4)(a)(c).
On these facts, the Eldridge balancing test clearly favors the private interest in deterring and being free of discrimination over the government's interest in using the challenged procedures. Moreover, within the context of the Eldridge balancing test, the federal precedent described supra which holds that administrative delay may violate due process, and the Supreme Court's ruling in Logan v. Zimmerman Brush Co., 455 U.S. at 434, 102 S.Ct. 1148, that a cause of action under state human rights law constitutes property interest that cannot be finally destroyed without first giving the putative owner an opportunity to present his claim of entitlement, the court finds no difficulty in concluding that the "clearly established constitutional or statutory rights" requirement of Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), is satisfied. These same sources of authority compel the conclusion that the defendants should have known that the Division's policies and practices unlawfully prejudiced the substantive rights of the categories of plaintiffs-intervenors described supra page 429. Therefore, defendants are not immune from the damage claims brought against them by these individuals. Butz v. Economou, 438 U.S. at 506, 98 S.Ct. 2894; Harlow, 457 U.S. at 818-19, 102 S.Ct. 2727.
Defendants' argument to the contrary is based on a characterization of the plaintiffs-intervenors' claims at an exceedingly and inappropriately high level of specificity. This mischaracterization of the right at stake enables the defendants to conflate the right with the Division's conduct. That is, the right at issue in this case is properly defined as the plaintiffs-intervenors' constitutionally protected interest in being heard "at a meaningful time and in a meaningful manner," Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), prior to the state's deprivation of their substantive anti-discrimination rights under the New York Human Rights Law. As demonstrated above, the Manzo principle has been affirmed and *435 expanded by the Supreme Court, and followed by the Second Circuit both prior to and after the ruling in Polk v. Kramarsky, 711 F.2d 505 (2d Cir.1983). Reasoning from Polk, however, the defendants define the right at stake not in terms of the plaintiffs-intervenors, but as the Division's putative constitutional license to be dilatory in processing complaints brought pursuant to the Human Rights Law. See Defs.' Mem. of Law at 12-13 ("[E]ven extreme delays at SDHR are permissible under the Fourteenth Amendment;").
Such a narrow definition of the right misapprehends the protections afforded to plaintiffs-intervenors by the due process clause, and thereby, the scope of an official's right to be qualifiedly immune from damage suits. The illogic and unfairness of defendants' way of reasoning about the propriety of plaintiffs-intervenors' damage claims is apparent. Under defendants' scheme, even the most egregious failure on the part of the Division to investigate complaints under the Human Rights Law (for example, a twenty-eight year delay in processing a complaint)[5] could not support a suit against state officials in their individual capacities because no court has expressly recognized an individual's right to challenge delays by SDHR in processing complaints that prejudice his ability to pursue the Human Rights complaint.
The result of defendants' reasoning is a "Catch 22" that is unacceptable under Supreme Court and Second Circuit precedent. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("the very action in question" need not previously have been unlawful for the law to be "clearly established" for purposes of qualified immunity analysis); Ayeni v. Mottola, 35 F.3d 680, 686 (2d Cir.1994) (holding that official's argument that law was not clearly established for qualified immunity purposes because "there is no reported decision that expressly forbids [his action]" was without merit).

c. Others Entitled to Sue for Damages
Those whose awards were reduced because of the Division's practices and policies also may sue defendants for damages. These are individuals who successfully pursued their claims, but whose awards were reduced by court order or by Commissioner Rosa due to SDHR's delay in processing their complaints.
On the preceding logic, these individuals are entitled to retroactive damages relief should plaintiffs-intervenors' suit against the defendants be successful. Like those categories of plaintiffs-intervenors described supra, page 429 who may have been actually prejudiced by the Division's dilatory processing of their complaints, these individuals have suffered as a result of SDHR's conduct. See State Univ. Agric. and Technical College at Farmingdale v. State Div. of Human Rights, 134 A.D.2d 339, 340, 520 N.Y.S.2d 814 (2nd Dept1987) (reducing back pay by six years) ("Absent any other indication in the record, it can only be concluded that the delay was attributable to the Division. The award of back pay unlawfully penalizes the petitioner [employer] for the division failure to act in a timely manner."); State Div. of Human Rights v. Massive Econ. Neighborhood Dev. Inc., 47 A.D.2d 187, 189, 366 N.Y.S.2d 23 (1st Dep.t1975) (eliminating pre-order interest due to "dilatory ways of the Division.").
Equity requires that they be able to recover their loss from those who are directly responsible for the reduction in their awards. These individuals cannot otherwise be "made whole," which is the remedial aspiration when citizens suffer unlawful discrimination. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).
Therefore, the line of state cases that prevents these individuals from full recovery is rejected. It is contrary to Supreme Court and Second Circuit precedent. See National Labor Relations Bd. v. J.H. Rutter-Rex Mfg. *436 Co., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969) (holding that the NLRB "is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers."); Bagel Bakers Council of Greater New York v. NLRB, 555 F.2d 304 (2d Cir.1977) (holding that costs should not be shifted "from the employers to the employees harmed by illegal conduct").

d. Failure to Pursue Federal Claim
The court agrees that due process analysis requires a consideration of all remedies available to a plaintiff. See Polk v. Kramarsky, 711 F.2d 505, 508 (1983) ("[T]he `process' available to plaintiff ... must taken to include the full remedial scheme, including the availability of the federal EEOC and the federal court."). Therefore, the categories of plaintiffs-intervenors who may sue defendants for damages must be limited to those who endeavored to take advantage of any claims that they may have been able to make under federal law.
Of course this directive is limited by the availability of a federal counterpart to the claim that the plaintiffs-intervenors made under the Human Rights Law. For example, no federal law protects individual from discrimination because of their "genetic predisposition." N.Y.Exec.Law § 296(1). Nor is there a federal counterpart to the Human Rights Law that protects individuals who are younger than 40 years of age. N.Y.Exec.Law § 296(3-a)(a) and (b). Thus, individuals who brought claims under the Human Rights Law on these bases would not be affected by this requirement. By contrast, to the extent that the claims and remedies for sex or race discrimination are the same under federal and state law, individuals who brought sex or race discrimination claims under the Human Rights Law must also have endeavored to bring suit under federal law in order to sue defendants for damages.
In summary, to the extent that a counterpart existed in federal law for any claim brought under the Human Right Law by the categories of plaintiffs-intervenors delineated supra, page 429, and 1) plaintiff-intervenor successfully brought the federal claim, or 2) plaintiff-intervenor did not attempt to avail himself of the federal claim, he cannot sue the defendants in their individual capacities. Such individuals have not been prejudiced by the Division's conduct.
If plaintiffs-intervenors ultimately prevail on their claims at trial, it will be left to the parties to formulate a methodology for determining to which class members this restriction may apply. In the event that this point is reached, disagreements as to which Human Right Laws have federal counterparts will be brought before and settled by the court.

III. Absolute Legislative Immunity
In response to plaintiffs-intervenors' claims against defendant Mercado for "promulgating and implementing" allegedly unconstitutional intake rules, (NOW Cmplt. at ¶¶ 28, 47), the defendants argue that Mercado is entitled to absolute legislative immunity from these claims. (Defs., Mem. of Law at 16).
The parties agree that it is clear that Mercado cannot be held liable for the promulgation of a rule or regulation. See Bogan v. Scott-Harris, ___ U.S. ___, ___, 118 S.Ct. 966, 972, 140 L.Ed.2d 79 (1998) ("Absolute legislative immunity attaches to all actions taken `in the sphere of legitimate legislative activity.'"); Supreme Court of Virginia v. Consumers Union of the United States, 446 U.S. 719, 731, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 405, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). They differ on whether Mercado's actions with respect to the Division's procedures and policies are and were legislative in nature. (Defs.' Mem. of Law at 17-18; Plfs.' Mem. of Law at 45-49).
Based on the record in this case, the court is not convinced that Mercado's actions were limited to legislative functions. He appears to have been involved not only in the promulgation of these rules, but in their administration. (Seegars Cmplt. at ¶¶ 31-32; NOW Cmplt. at ¶¶ 32-33, 46-47, 50-53). Therefore, Mercado is not entitled to absolute immunity from suit. See e.g. Forrester v. White, 484 U.S. 219, 225, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) ("[T]he highest executive *437 officials in the States [are not] protected by absolute immunity under federal law."); Scheuer v. Rhodes, 416 U.S. 232, 239-43, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973).

IV. Conclusion
For the reasons stated above, defendants' motion to dismiss on grounds of qualified immunity is granted as to the plaintiff-intervenors described supra, page 428, and denied as to the plaintiff-intervenors described supra page 429, as modified by the requirement that they must have sought to avail themselves of federal rights, to the extent that a federal counterpart was available. Defendant Mercado's absolute legislative immunity motion also is denied.
IT IS SO ORDERED.
NOTES
[1] In his Report and Recommendation, dated May 19, 1995 (the "Initial Report"), Magistrate Judge James C. Francis, IV found that plaintiffs had sufficiently established that the Human Rights Law creates an entitlement to have discrimination complaints heard without prejudicial delay, thereby providing complainants with a property right protected by the Fourteenth Amendment. (Initial Report at 45). This court adopted the magistrate's finding. See Cuomo, 1998 WL 157029 at *12.
[2] This finding is modified by the requirement that these complainants must have attempted to take advantage of federal anti-discrimination provisions. See infra, p. 436.
[3] In fact, subsequent to the commencement of the litigation in Logan but prior to the rendering of the Court's decision in that case, Illinois replaced the FEPA with the more comprehensive "Illinois Human Rights Act," and replaced the FEPC with two agencies, a "Department of Human Rights" and a "Human Rights Commission." Logan, 455 U.S. at 425 n. 1, 102 S.Ct. 1148. Thus, the nomenclature used by the states of New York and Illinois for their anti-discrimination agencies and the protections afforded by their anti-discrimination statutes is now virtually indistinguishable.
[4] The Second Circuit's precedent on the constitutional implications of administrative delay has been remarkably consistent with the Supreme Court's jurisprudence on this issue, so much so that the decision reached in Polk v. Kramarsky, 711 F.2d 505 (2d Cir.1983), seems aberrant. In fact, it is unclear that the outcome in Polk that was reached by the Circuit Court in 1983 would be the same if the case were decided by the Court of Appeals today. However, it is not for this court to make a determination about the precedential value of Polk.
[5] The hypothetical doubles the longest delay on record by the Division in processing a complaint under the Human Rights Law  a 14 year delay in processing a woman's claim that she was unlawfully terminated by her employer due to her pregnancy. Diaz v. New York State Division of Human Rights, 91 N.Y.2d 932, 934, 670 N.Y.S.2d 397, 693 N.E.2d 744 (N.Y.Ct.App.1998) ("The combined 14-year gap in this case from complaint to decision presents only the most extreme fact pattern, thus far brought to this Court's attention and docket").