SEYMOUR, Chief Judge,
dissenting.
In holding that a probationer’s constitutional privacy right to non-disclosure of his confidential medical information by his probation officer was not clearly established in late 1993, the majority extrapolates from the Supreme Court’s bare holding in Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), without addressing the underlying analysis and reasoning used therein, ignores other circuit precedent on point, and requires an inappropriately exacting factual similarity between prior cases and the case at bar. In my judgment, at the time of the events at issue, the law was clear that Mr. Herring enjoyed constitutional privacy protection against involuntary disclosures of personal information because there was no legitimate governmental interest in the disclosure, and Ms. Keenan’s disclosure of such information was objectively unreasonable. For these reasons, I respectfully dissent.
I
In assessing whether a qualified immunity defense lies for a government official, we make two inquiries: “First, we must ask what was the clearly established law with regard to the plaintiff’s] constitutional rights at the time those rights were allegedly violated by [the official].... Second, if the law was clearly established, we must ask whether [the official’s] conduct was ‘objectively reasonable’ in light of this clearly established law.” Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir.1997).

A. Clearly established law as it existed in 1993

Ms. Keenan’s conduct here occurred in late 1993. By then, as the majority acknowledges, this circuit had clearly recognized that the constitutional right to privacy as defined by Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), includes an individual’s interest in avoiding disclosures of sensitive personal matters. See Flanagan v. Munger, 890 F.2d 1557, 1570 (10th Cir.1989); Eastwood v. Department of Corrections, 846 F.2d 627, 630-31 (10th Cir.1988); Mangels v. Pena, 789 F.2d 836, 839 (10th Cir.1986); Slayton v. Willingham, 726 F.2d 631, 635 (10th Cir.1984). To ascertain whether Ms. Keenan’s conduct violated this clearly established law, I agree with the majority that we must determine to what extent in 1993 this constitutional right applied to a probationer against disclosures by a probation officer. Precedent from the Supreme Court and other circuits establishing the privacy rights of prisoners and probationers guides this undertaking.
1. Griffin
As the majority acknowledges, in 1987 the Supreme Court in Griffin upheld a probation regulation against a probationer’s challenge that it violated his Fourth Amendment rights. The regulation at issue there required probationers to consent to a search of their homes anytime a probation officer had “reasonable grounds” to believe an offense was being committed. In reaching its conclusion, the Court began its analysis with the statement that probationers “do not enjoy ‘the absolute liberty to which every citizen is entitled but only ... conditional liberty,’ ” due to the State’s interests in reducing recidivism and ensuring the community is not harmed by the probationer’s being at large. Griffin, 483 U.S. at 874, 107 S.Ct. 3164 (quoting Morrissey v. Brewer, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Significantly, the Court recognized that while these state interests “permit[ ] a degree of impingement upon privacy that would not be constitutional if applied to the public at *1182 Iarge[, t ]hat permissible degree is not unlimited, Id. at 875, 107 S.Ct. 3164 (emphasis added). Only after recognizing the probationer’s general right to privacy did the Court turn to the question .of whether this right was overly impinged by the probation regulation, a determination made by balancing the probationer’s rights against the governmental interests associated there. Griffin, therefore, clearly established six years prior to the incidents here that probationers retain a right to privacy under the Constitution which is violated where the State impinges upon that right without a legitimate, governmental purpose.
The majority here simply relies upon the Court’s approval of the regulation in Griffin to conclude that Mr. Herring’s privacy right was not clearly established in this case. In so doing, the majority extrapolates from the Court’s naked holding without ever acknowledging the underlying analysis and reasoning, and fails entirely to apply that analysis and reasoning to the facts of this case. The majority thus ignores the clear holding in Griffin that a probationer has a constitutional right to privacy which is only limited insofar as the limitation is.justified by “the ‘special need[s]’ of the probation system.” Id. at 875, 107 S.Ct. 3164. See also Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (holding that prison regulations impinging on prisoners’ constitutional rights are only valid where reasonably related to legitimate penological interests); Doe v. Attorney Gen., 941 F.2d 780, 796 (9th Cir.1991) (in 1988, law was clear that government may use private information only if it can show that its use of the information advances a legitimate state interest).
Although the legitimacy of the governmental interest was crucial to the Griffin analysis, the majority fails to address what interest is at issue here. This flaw proves fatal to its reasoning because, simply put, there was no legitimate governmental interest in Ms. Keenan’s conduct. Her unauthorized actions were both erroneous and objectively unreasonable because she acted in violation of both established probation procedures and Colorado state law.
In making the disclosures to Mr. Herring’s family and employer, Ms. Keenan acted contrary to every written guideline addressing the disclosure of confidential medical information contained in the U.S. Probation Manual, which serves as “the authoritative standard for community supervision of federal offenders.” Guide to Judiciary Policies and Procedures, vol. X (U.S. Probation Manual) [hereinafter Manual], ch. TV, at 1; see App. 1186.[1] The Manual clearly states the goal of “protecting the confidentiality of exposed persons” in their HIV status, id., and mandates that “[ojfficers should not disclose HIV infection or illness information without the offender’s informed written consent,” id. at 16; App. at 1187. The Manual further prohibits probation officers from disclosing information to employers without written approval by the officer’s supervisor or chief probation officer. Id. at 38; App. at 1190. If the probationer opposes such disclosure, it may not be made without a hearing by the court. Id. Finally, the disclosure can only be with regard to a reasonably foreseeable risk the probationer poses to the employer or the public, and the risk, must be related to the offender’s past criminal conduct.[2] Id. at 36-37; App. at 1189.
*1183 Ms. Keenan also 'violated state criminal law, which prohibits the disclosure of medical information to unauthorized persons. See Colo.Rev.Stat. § 18^1-412 (criminalizing the disclosure of medical information to an unauthorized person without prior written authorization); Colo.Rev.Stat. § 24-4-1402 (the only authorized disclosures are by medical personnel treating patients and made in the form of reports to the state or local department of public health). In fact, Ms. Keenan’s Manual specifically warned her that state civil and criminal penalties could attach to the violation of a probationer’s confidentiality surrounding his HIV status, and instructed her to learn the applicable state law. See Manual, ch. IV, at 16, App. at 1187. In addition, Ms. Keenan was required to consult with the probation office’s expert on HIV and state confidentiality laws upon learning of Mr. Herring’s possible HIV status, a regulation undoubtedly intended to avert the sort of violation which occurred here. See id. at 18; App. 1187, 1188.
Despite the statutes and guidelines described above, the government argues that Ms. Keenan disclosed Mr. Herring’s purported HIV status to his employer and family to prevent him from breaking Colorado law while on probation, citing Colo. Rev.Stat. § 25-4-108.[3] It is clear, however, that Mr. Herring was not violating section 25-4-108, which prohibits a person with a contagious disease from working in the food service industry, because this statute is inapplicable to HIV-positive individuals under Colorado’s health code. See Colo.Code Regs. § 11CR1, Reg. 6 (only persons prohibited from working in food service pursuant to § 25^1-108 are those infected with a disease transmittable through food handling). Morever, reliance on this law was unreasonable because it was antiquated (passed in 1913 and amended once in 1921) and has never been applied in any published case. In fact, the only annotation to this statute contained in Colorado’s official reporter cites to an article, published in 1988, describing the inapplicability of the statute in the context of HIV-positive employees.[4]
The Manual’s guidelines, with their reference to state statutes, reflect a reasoned governmental commitment to preserve a probationer’s privacy in his confidential medical information. It is significant that in Griffin the Court was called upon to analyze the legitimacy of a governmental interest embodied in an officially established policy. There the Court assessed the probation regulation’s constitutionality in light of the probation system’s asserted special needs underlying it. See Griffin, 483 U.S. at 875-79, 107 S.Ct. 3164. Importantly for our purposes, the Court concluded that the search of a probationer’s residence was “reasonable within the meaning of the Fourth Amendment be *1184 cause it was conducted pursuant to a valid regulation governing probationers,” id. at 880, 107 S.Ct. 3164 (emphasis added), which was itself justified by the special needs of the probation system making the warrant requirement impractical.
Here, however, we are asked to review the independent action of a probation officer which was directly contrary to the published guidelines of the U.S. Probation Office. Ms. Keenan cannot plausibly argue that her random, unauthorized and illegal conduct provides a basis for a legitimate or reasonable governmental interest sufficient to warrant the intrusion on Mr. Herring’s privacy rights which occurred here.[5]
It is true that violation of internal guidelines, or even state laws, does not undermine a qualified immunity defense where the constitutional right was not otherwise clearly established. See Davis v. Scherer, 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Such violations may be considered, however, where they are relevant to the constitutional interest itself. See id. at 193 n. 11, 104 S.Ct. 3012 (recognizing that laws and regulations “may bear upon” the existence of a constitutional interest). Ms. Keenan’s violation of her own guidelines and state laws serves to point up the fact that her actions served no legitimate probation interest to balance against Mr. Herring’s privacy right. Without such an interest, as Griffin makes clear, the impingement on Mr. Herring’s right to privacy right is impermissible under the Constitution.
2. Other circuit authority
As the majority correctly recites, whether a right was clearly established turns not only on whether there is Supreme Court or Tenth Circuit precedent on point, but alternatively, on the “weight of authority from other courts.” Anaya v. Crossroads Managed Care Sys., Inc., 195 F.3d 584, 594 (10th Cir.1999). Notwithstanding this, the majority ignores the two cases in the federal courts of appeals with the most substantial factual correspondence to the case at bar, see Harris v. Thigpen, 941 F.2d 1495 (11th Cir.1991), and United States v. Stine, 675 F.2d 69 (3d Cir.1982), while concluding that the right was not clearly established because there was no “further guidance from the Supreme Court or this circuit,” Maj. Op. at 1176.
These two cases, like Griffin, start from the premise that an offender retains a constitutional privacy right which must be balanced against the government’s legitimate interests to determine whether the probationer’s rights are impermissibly impinged. In Thigpen, the Eleventh Circuit evaluated a prison policy which segregated inmates on the basis of their HIV status, thereby necessarily disclosing the inmates’ status to other prisoners, prison officials, and visitors. The court recognized “the general principle” that prisoners retain their constitutional rights, including the right to privacy, so long as they are not *1185 inconsistent with inmate status or legitimate penological interests. See 941 F.2d at 1512-13 (citing Turner, 482 U.S. at 84, 107 S.Ct. 2254, Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and Houchins v. KQED, Inc., 438 U.S. 1, 5 n. 2, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978)). After balancing the prisoners’ privacy interests against the government’s asserted interests in segregating HIV-positive inmates from the general prison population to prevent transmission to other inmates and protect prison guards, the court concluded that the HIV segregation policy was reasonable and therefore not a violation of the prisoners’ privacy rights. See id. at 1521.
Similarly, in Stine, the Third Circuit employed the same analytical framework to uphold a probation condition requiring a probationer to undergo psychological counseling against his challenge that the requirement violated his constitutional right to privacy. In so holding, the court specifically stated that a probation condition which impinges on constitutional rights will be upheld only where the condition of probation is reasonably related to the purposes of probation and the impact on the probationer’s privacy rights is no greater than necessary to carry out these purposes. See 675 F.2d at 72.[6]
A comparison of the legitimate governmental interests in Thigpen and Stine illustrates how devoid Ms. Keenan’s actions were of any significant probation interest. The government’s interests in segregating the prisoners in Thigpen was to reduce potential transmission of HTV in light of common documented risks existing in a prison environment, which included bloody fights, intravenous-drug use and needle-sharing, tattooing, and unprotected sexual activity. See Thigpen, 941 F.2d at 1516-19. The government’s interests in the psychological counseling requirement in Stine was to promote rehabilitation and decrease the likelihood of recidivism. See Stine, 675 F.2d at 71-72. Those important penological and treatment interests justified the intrusions on individual privacy rights at issue in Thigpen and Stine.[7] As discussed above, Ms. Keenan’s actions in the present case represent no such interests; her conduct neither assisted in Mr. Herring’s rehabilitation nor protected anyone from a foreseeable risk of HIV transmission.
In sum, the law was clear in late 1993 that the Constitution provides a privacy right to the non-disclosure of confidential information and that this constitutional right applies to prisoners and probationers and unless limited by a legitimate governmental interest.[8] Because Ms. Keenan *1186 lacked any legitimate, probationary interest in disclosing Mr. Herring’s HIV status to Ms family and his employer, her actions violated this clearly established law.

B. Objective unreasonableness

Because the majority concludes Mr. Herring’s claimed right was not clearly established in late 1993, it never reaches the reasonableness prong of the qualified immunity analysis. Given the lack of governmental interest in Ms. Keenan’s conduct as established above, one can only conclude that it was objectively unreasonable in light of the clearly established law. Ms. Keenan’s disclosure of highly sensitive confidential information was not only unauthorized, it was also criminal. Indeed, trumping all arguments to the contrary is the fact that Ms. Keenan did not even know whether Mr. Herring was actually HIV-positive; Mr. Herring only told her he might be. This final fact destroys any claim to objective reasonableness Ms. Keenan might make.
Even assuming that Ms. Keenan’s concerns were remotely reasonable, there is no reason she had to act so quickly that her misconduct should be excused. See Scheuer v. Rhodes, 416 U.S. 232, 246, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (one purpose of qualified immunity is to enable officers and officials to act swiftly when “there is obvious need for prompt action” or in “an atmosphere of confusion, ambiguity, and swiftly moving events”). She offers no reason, and I can think of none, that required her to immediately disclose Mr. Hening’s HIV status, without pausing to consult the applicable probation guidelines, review state law on the subject, meet with her office’s expert on state confidentiality laws, or even confirm the verity of the information she was passing along.
In sum, a reasonable probation officer in Ms. Keenan’s position would have known that disclosing Mr. Herring’s HIV status would violate his constitutional right to privacy.
II
I cannot agree with the majority’s disregard of the clearly established law as it existed in late 1993 and its misguided analysis of the qualified immunity issue. Because Ms. Keenan’s conduct violated this clear law and was objectively unreasonable, I would affirm the district court’s denial of Ms. Keenan’s motion to dismiss.
I respectfully DISSENT. I would affirm the district court’s denial of Ms. Keenan’s motion to dismiss on the basis of qualified immunity.
APPENDIX*
GUIDE TO JUDICIARY POLICIES AND PROCEDURES, VOL. X
CHAPTER IV. SUPERVISION SERVICES
Part A. The Supervision of Federal Offenders. (Monograph 109)
In June 1991, the Probation and Pretrial Services Division published Supervision of Federal Offenders, Monograph 109. The document serves as the authoritative standard for community supervision of federal offenders. U.S. probation officers should refer to the monograph for the development and implementation of all supervision policies and procedures.
Part B. Administrative Procedures for Probation and Supervision Release Supervision.
*1187 16. Supervision of HIV-Positive Offenders.
The Judicial Conference Committee on Criminal Law and Probation Administration has promulgated guidelines for probation officers for supervising offenders who have been exposed to human immunodeficiency virus (HIV). The guidelines are intended to provide guidance in preventing the transmission of HIV within the community as well as protecting the confidentiality of exposed persons. HIV infection refers to the condition of persons who are known to have been exposed to HIV and who are either asymptomatic or have symptomatic HIV disease. Acquired immune deficiency syndrome (AIDS) is the most serious form of HIV disease.
Officers in each district should learn the State laws which govern the use of HIV tests and the disclosure of their results. State statutes also address civil and criminal penalties which attach to violation of confidentiality. Officers should only implement the guidelines in a manner consistent with State law. The guidelines are as follows:
A. Officers, in consultation with the resource person in the office, should evaluate the HIV-positive person and develop a case plan, keeping in mind education, counseling, and treatment components.
B. Officers should not supervise offenders with HIV infection, including those who have developed AIDS, differently than any other offender unless medically indicated on the basis of symptoms or coexisting infections.
C. Officers should instruct the offender of the importance of self-disclosure of HIV infection to prospective sexual/drug partners. The individual should be advised of possible civil or criminal liabilities for transmission of HIV to another person.
D. Officers should not disclose HIV infection or illness information to the offender’s family members, parents, or sexual/drug partners without the offender’s informed, written consent. If the offender mil not consent to disclosure and State law permits non-consensual disclosure to public health officials, the officer should notify such officials. Notification of other third parties is the responsibility of the exposed person. Partner notification programs conducted by public health agencies encourage patient and physical responsibility for third-party notification and in many States assume the burden for confidentiality and ensuring notification by trained disease control specialists.
E. Officers in all cases should first attempt to have the offender give informed, written consent authorizing the release of information about HIV infection to the U.S. marshal, residential facilities, halfway houses, and jails. In the absence of such written consent, this information should be disclosed to the U.S. marshal when a violator’s warrant is issued and to the health care provider and/or supervisor of the halfway house or jail facility when the offender is placed in their custody.
F. Officers should seek the written, informed consent of the offender before making further disclosure when information concerning an individual’s HIV antibody test result or information concerning a diagnosis of HIV infection is disclosed to the officer by a third party or by the offender. In preparing the consent form, officers should attempt to obtain an authorization to disclose to those individuals who have a legitimate need to know such as sexual/drug partners, public health officials, health care and drug treatment providers, custodial officers, and the court.
*1188 When an informed, written consent is obtained, information concerning an offender’s diagnosis of AIDS, positive test results for HIV, and signed consent forms should be reported in the case record, but kept in an envelope in a portion of the file marked “Confidential Information.” Pretrial diversion reports, postsentence reports, and any other social history investigations contained in the offender’s case file which contain such confidential medical information should also be placed in the envelope marked “Confidential Information.” Redisclosure of test results or an offender’s medical condition should not be made without specific additional consent by the offender.
Confidential record information should be treated like other medical record information and may be shared with other staff who are associated with the offender and have a legitimate, professional need to know.
G. Officers should not disclose information regarding offenders with HIV infection in presentence reports without the offender’s written, informed consent unless it is relevant to the offense charged such as a sexual assault. The court, however, may require the officer to disclose all known medical information about the offender in order to determine its relevancy in the disposition of the case. In this situation the officer should confidentially advise the court of the offender’s positive HIV test results, current symptomatic status, and refusal to give consent for disclosure of this information pursuant to the provisions of Rule 32(c)(3)(A) of the Federal Rules of Criminal Procedure.
H. Printed education materials on communicable diseases and infection control precaution should be made available to all offenders in office waiting rooms and given to officers for distribution and discussion with offenders and their families. Staff may use appropriate locally available written materials from community HIV and AIDS testing and counseling sites. Officers should identify available local resources (medical, social, and psychological services for people with HIV infection and local public health agencies) and should assist their offenders upon request in gaining access to such services.
I.Each probation office should identify and designate an officer as an HIV resource person. That individual will participate in regional training activities concerning HIV infection and will gain a competent understanding of information related to HIV infection. This resource person should be available to all staff within the district as a consultant on HIV infection and related issues. Officers should consult this resource person whenever they encounter a case situation involving HIV or AIDS. The resource person should become an expert in State confidentiality laws and should provide the office with periodic updates on the current state of the law.
Part D. Releasing File Information.
1. Releasing File Information (Probationers and Supervised Releasees).
While a defendant may retain a copy of his/her presentence report pursuant to the provisions of Rule 32(c)(3)(A) of the Federal Rules on Criminal Procedure, probation and supervised release files are under the court’s jurisdiction. Disclosure of the content of the files is the prerogative of the court. Files are maintained for the primary purpose of reporting to the court on the conduct and condition of probationers (18 U.S.C. *1189 §§ 3563 and 3565), and to aid persons under supervision to bring about improvements in their conduct and condition. The court has a need for a free flow of information regarding the conduct of those under supervision. Persons who provide information to the probation officer, including the offender, should feel secure in giving information and know it will be used primarily by the court. Indiscriminate dissemination of information should be avoided.. ...
2. Disclosure of Third Party Risk Information (Probationers and Supervised Releasees).
Probation officers have an equal obligation to control risk to the public and provide correctional treatment to the offender. In meeting these obligations, the officer has a duty to warn specific third parties of a particular prospect of harm, physical or financial, which the officer “reasonably foresees” the offender may pose to them. This obligation exists whether or not the third party has solicited the information.
The Office of General Counsel has provided standards for disclosure of information concerning risk in probation and supervised release cases as follows:
A. The circumstances of all offenders under supervision should be reviewed periodically to determine whether they might pose a reasonably foreseeable danger to a third person.
B. Guidelines for disclosures of third party risk information are selective. A warning is not required in every case, only where a reasonably foreseeable risk of harm to a specific third party is believed to exist.
C. The requirement an offender under supervision refrain from engaging in a particular type of employment or inform his employer or another specified third party about his criminal conviction should generally be imposed by the court as a formal special condition of probation. See United States v. Alexander, 743 F.2d 472, 480 (7th Cir.1984). Such a condition is unnecessary if the offender is willing to comply with the disclosure requirement and it is not an adversary issue.
D.A disclosure requirement must be reasonably related to the correctional treatment of the offender and/or the protection of the public.
(1) Determination of Risk.
The determination of whether a “reasonably foreseeable” risk exists depends upon a selective, case-by-case evaluation. Among other factors, the evaluation should be based upon the offender’s employment, offense, prior criminal background, and conduct. The officer should pay special attention to employment or other circumstances which present the offender with an opportunity or temptation to engage in criminal or antisocial behavior related to the offender’s criminal background.
(2) ‘Reasonably Foreseeable” Risk.

“Reasonably foreseeable” risk means the circumstances of the relationship between the offender and the third party (e.g., employer and employee) suggest the offender may engage in a criminal or antisocial manner similar or related to past conduct.

(3) Making Disclosure Decisions.
(a) If the probation officer determines no reasonably foreseeable risk exists, then no warning should be given.
(b) If the officer determines a reasonably foreseeable risk exists, the officer should decide, based upon the seriousness of the risk created and the possible jeopardy to the offender’s employment or other aspects of rehabilita *1190 tion, whether to: give no warning, but increase the offender’s supervision sufficiently to minimize the risk; give no warning, but preclude the offender from the employment; or give a confidential warning to the specific third party sufficient to put the party on notice of the risk. The officer may permit the offender to make the disclosure with the understanding the officer will verify it.
(c) If the court has not imposed a special condition precluding the offender from specified employment or requiring a warning to a specific third party, decisions regarding disclosure or alternative action must he approved by the officer’s supervisor or the chief probation officer. Such approval should be in writing.
(d) If the officer decides to preclude the offender from a particular job or type of employment, and the offender is unwilling to comply, the officer should request the court hold a hearing on modification of conditions. Rule 32.1, Federal Rules of Criminal Procedure.
(e) If the officer decides to warn the offender’s employer or another specific third party, and the offender strongly opposes such action, the officer should present the matter to the court and request either an order directing the officer to make the learning or a modification hearing to impose a condition that the offender make the 'necessary disclosure.
Any questions concerning the propriety of a disclosure under these guidelines that cannot be resolved after consultation with the supervisor and chief probation officer may be directed to the Office of General Counsel.
Examples of appropriate disclosure decisions are as follows:
P, a financial scheme criminal, starts his own “home security” business. Although P could use information gained in the business to burglarize homes or sell the security plans to the underworld, neither possibility is very similar to his criminal conviction. On these facts a risk exists, but not a reasonably foreseeable risk. No warning disclosure should be made. The officer should simply monitor P’s monthly financial records, income, and lifestyle.

. All of the guidelines referred to herein are set out in full as an appendix to this opinion. See App. A-l-A-8. These guidelines are promulgated by committees composed of federal judicial officers, and are prepared and distributed by the Director of the Administrative Office under the supervision and direction of the Judicial Conference. 28 U.S.C. § 604(d)(4). See also Guide to Judiciary Policies and Procedures, vol. X, ch. IV at 16; App. at A-6 (guidelines governing supervision of HIV-infected offenders promulgated by the United States Judicial Conference Committee on Criminal Law and Probation Administration); id. at 36; App. at A-5 (standards governing disclosure of third-party risk information promulgated by the Office of General Counsel).

. Mr. Herring’s criminal offense was driving while intoxicated, hardly the type of activity that risks the transmission of HIV to family *1183 members, co-workers, and restaurant patrons.

. The government also argues that Ms. Keenan’s disclosure was intended to avert the risk of HIV infection to the cafe’s customers and employees, and to Mr. Herring's family. In 1993 it was common knowledge that HIV transmission only occurs through the exchange of bodily fluids, most often through sharing needles or unprotected sexual intercourse. See, e.g., Harris v. Thigpen, 941 F.2d 1495, 1503 (11th Cir.1991) ("virtually no evidence exists that HIV is spread through casual (even intimate) non-sexual contact; ... food; inanimate objects, e.g. toilet seats, drinking fountains or eating utensils; insects; skin; vaccines; or water"). There is no evidence in the record that Mr. Herring was an intravenous-drug user or that he was having sexual relations with his family, his co-workers, or anyone at the café. Therefore, the risk that he would transmit the disease to any of these people was undeniably remote.

. See Edward P. Richards, Communicable Disease Control in Colorado: A Rational Approach to AIDS, 65 Den. U.L.Rev. 127, 144-45 (1988). The article not only states that this law is inapplicable to persons who are HIV-positive, it also highlights that reporting a person's HIV status to anyone other than the Colorado Department of Health is criminalized under Colorado law. Had Ms. Keenan checked this law in the statute books, she would have known it was not applicable to Mr. Herring and that her disclosure was in fact a crime under Colorado law.

. The government argues that because Ms. Keenan would have to balance the government’s interests to determine whether her conduct would violate Mr. Herring’s constitutional right to privacy, the law could not be clearly established. It is true that where a constitutional deprivation is determined by balancing opposing factors, this mitigates against a finding of clearly established law. See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir.1992). However, we have stated on numerous occasions that qualified immunity is nevertheless abrogated if it was "sufficiently clear that Defendants should have known the [governmental] interests would not survive a balancing inquiry.” Patrick v. Miller, 953 F.2d 1240, 1246, 1249 (10th Cir.1992). See also Prager v. LaFaver, 180 F.3d 1185, 1191-92 (10th Cir.1999) (balance in favor of plaintiff should have been anticipated by officials and thus their qualified immunity was abrogated), cert. denied — U.S. —, 120 S.Ct. 405, 145 L.Ed.2d 315; Medina, 960 F.2d at 1498 (”[C]onduct may be so egregious that a reasonable person would know it to be unconstitutional even though it is judged by a balancing test.”). Because there was no legitimate governmental interest to be balanced here, and in light of the fact that her conduct violated state law and her own guidelines, Ms. Keenan should not be able to claim qualified immunity simply because there was a balancing test involved.

. In contrast to Thigpen and Stine, the Sixth Circuit held in 1981 that no one has a general constitutional right to privacy in the nondisclosure of personal information. See J.P. v. DeSanti, 653 F.2d 1080 (6th Cir.1981). This one case does not minimize the clear weight of our circuit’s pre-1993 authority holding that such a constitutional privacy right does exist, see discussion supra at 1172, and Thig-pen and Stine's application of that right to prisoners and probationers.

. Moreover, as in Griffin, it was an officially established requirement in Thigpen and Stine that was balanced against the plaintiffs’ privacy rights. See Thigpen, 941 F.2d at 1499 (Department of Corrections policy); Stine, 675 F.2d at 70-71 (court-ordered probation condition). Here, the government asks us to balance Mr. Herring’s privacy interest against Ms. Kennan’s personal decision to take action when that action was contrary to the official guidelines of the probation department, which specifically disavowed any governmental interest whatsoever in the disclosure of HIV information.

.The majority requires an inappropriately exacting factual similarity between prior cases and the facts sub judice to defeat the defense of qualified immunity. The majority concludes that Ms. Keenan should benefit from qualified immunity because in late 1993, "there were no decisions from any federal court that discussed whether a probation officer had a duty not to disclose [the probationer's confidential medical information] to a probationer's sister and his restaurant employer.” Maj. Op. at 1180; see also id. at 1176, 1178-79, 1179. To demonstrate a clearly established right, a plaintiff need not identify a case holding unconstitutional the exact conduct in question. Rather, "this circuit requires only ‘some but not precise factual correspondence.' ” Eastwood, 846 F.2d at 630. While the majority gives lip service to *1186 this standard, it then turns Griffin on its head and rejects Mr. Herring’s claim because he has not cited a federal court of appeals case with exactly the same type of plaintiff and defendant, and precisely the same type of disclosure. In so doing, the majority relieves government officials of their “incumbent” duty "to relate established law to analogous factual settings." Id.

 For purposes of this Appendix, underlined emphasis is in original and italicized emphasis is added.